SHIRLEY S. ABRAHAMSON, C.J.
¶ 146. (dissenting.) "Advances in technology offer great benefits to society in many areas. At the same time, they can pose significant risks to individual privacy rights."[1] The proliferation of cell phones and their location tracking capabilities exemplify the risks to privacy rights posed by technological advancement.
¶ 147. The criminal cases State v. Tate[2] and State v. Subdiaz-Osorio[3] raise the question whether individuals have a constitutional right of privacy in their cell *116 phone location data. In other words, do the United States[4] and Wisconsin Constitutions[5] permit law enforcement to access a person's cell phone location data without a warrant?
¶ 148. Cell phones are a "pervasive and insistent part of daily life . . . ."[6] The vast majority of Americans own cell phones; the Pew Research Center has reported that, as of May 2013, 91% of American adults have a cell phone and 56% have a smartphone.[7] Cell phones are literally and figuratively attached to their users' persons, such that "the proverbial visitor from Mars might conclude they were an important feature of human anatomy."[8] Unlike land-line phones, people generally carry cell phones with them at all times — at home, in the car, at work, and at play.
*117 ¶ 149. Cell phones can thus serve as powerful tracking devices that can pinpoint our movements with remarkable accuracy. They can isolate in time and place our presence at shops, doctors' offices, religious services, Alcoholics Anonymous meetings, AIDS treatment centers, abortion clinics, political events, theaters, bookstores, and restaurants, and identify with whom the user of the cell phone associates.[9] Cellular service providers have records of the geographic location of almost every American at almost every moment of the day and night.[10] Accessing this information reveals intimate details about a person and intrudes on the constitutional right of association. The United States Supreme Court characterizes location data as "qualitatively different" from physical records, noting that location data can "reconstruct someone's specific movements down to the minute, not only around town but also within a particular building."[11] The more precise the tracking, the greater the privacy concerns.
¶ 150. Cell phone location data can also be a formidable instrument in fighting crime. In both Tate and Subdiaz-Osorio, the law enforcement officers were performing their important public safety duties by investigating violent crimes. Both criminal suspects were apprehended in relatively short order through law enforcement use of cell phone location data.
*118 ¶ 151. The officers in Tate and Subdiaz-Osorio had to deal with the thorny issues raised by seeking access to individuals' cell phone location data. Law enforcement is the first word in interpreting constitutional requirements; the courts are the last.
¶ 152. It is this court's responsibility to evaluate a potential search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Wyoming v. Houghton, 526 U.S. 295, 300 (1999).
¶ 153. This court owes it to law enforcement, lawyers, litigants, circuit courts, the court of appeals, and the public at large to provide clarity about when a search has occurred regarding cell phone location data and what procedures must be undertaken by the government to render such searches constitutional.[12] A clear set of rules will protect privacy interests and also give guidance to individuals evaluating these interests.
¶ 154. Rather than dance around the issue of whether government access to cell phone location data in the instant cases is a search within the meaning of the Constitutions, I propose that the court address it head-on. Government access to cell phone location data raises novel legal questions of great importance for the privacy rights of the public in an emerging area of technology — exactly the type of questions appropriate for resolution pursuant to this court's law-developing function.
¶ 155. I conclude that government access to cell phone location data in the instant cases, which involves *119 invasive surveillance of an individual's movements, is a search within the meaning of the Constitutions.[13] To read the Constitutions more narrowly is to ignore the vital role that the cell phone has come to play in private communications, to paraphrase the United States Supreme Court in Katz v. United States, 389 U.S. 347, 352 (1967).[14]
¶ 156. People do not buy cell phones to have them serve as government tracking devices. They do not expect the government to track them by using location information the government gets from cell phones.[15] People have a subjective expectation of privacy in cell phone location data that society is prepared to recognize as reasonable. Thus, absent a warrant, such a search is per se unreasonable.[16]
¶ 157. If the State does not have a warrant, the State can access cell phone location data only if the State can demonstrate one of the narrowly drawn exceptions to the warrant requirement. In both Tate and Subdiaz-Osorio, law enforcement officers could have accessed cell phone location data with a properly *120 authorized warrant that complied with existing relevant statutes.[17] They did not.
¶ 158. I address the balance between privacy interests and law enforcement interests as presented by Tate and Subdiaz-Osorio,[18] These two cases address substantially similar issues regarding government access to cell phone location data but pose distinct fact patterns.
¶ 159. Neither the Tate majority opinion nor Justice Prosser's lead opinion in Subdiaz-Osorio decides whether the government access in question constituted a search within the meaning of the United States and Wisconsin Constitutions. Both opinions assume that a search occurred.
¶ 160. Despite the insistence of the Tate majority opinion and Justice Prosser's lead opinion in Subdiaz-Osorio that they merely assume, without deciding, that the government access was a search in each case,[19] both opinions address the search issue as they elaborate on cases and principles underlying their assumption that a search occurred.
¶ 161. The Tate majority opinion and Justice Prosser's lead opinion in Subdiaz-Osorio refer to and draw guidance from the same Wisconsin and United *121 States Supreme Court cases, including the recently-mandated Riley v. California, 573 U.S. _, 134 S. Ct. 2473 (2014).[20]
¶ 162. The Tate majority opinion and Justice Prosser's lead opinion announce principles of law that overlap and to an extent conflict with each other.[21] The two opinions, as well as the separate writings in Subdiaz-Osorio of Justices Ann Walsh Bradley, N. Patrick Crooks, and Patience Drake Roggensack, must thus be read together carefully to understand the court's position on the constitutionality of law enforcement access to a person's cell phone location data.[22]
¶ 163. To address the overlapping issues raised by these two cases, I organize my dissenting opinions as *122 follows. Each heading number corresponds to the relevant subdivision of each dissent.
¶ 164. In my dissent in Tate, I address the following main points:
Part I. The police access to the defendant's cell phone location data, an issue in both Tate and Subdiaz-Osorio, was a search within the meaning of the Constitutions.[23]
Part II. The search existed as a trespass.[24]
Part III. The search existed as an invasion of an individual's reasonable expectation of privacy.
*123 A. The subjective expectation of privacy was not undermined by:
1. The cell phone contract;[25] or
2. The third-party doctrine.[26]
B. Society recognizes a reasonable expectation of privacy in cell phone location data.[27]
*124 Part IV. Wisconsin Stat. § 968.135, the statute setting forth the requirements for a subpoena of documents, should have been followed — it was not in either Tate or in Subdiaz-Osorio.[28]
¶ 165. In my dissent in Subdiaz-Osorio, I address two main points:
Part V The State failed to meet its burden to demonstrate the existence of exigent circumstances;[29] and
*125 Part VI. The defendant invoked his Miranda right to an attorney at his interrogation.[30]
¶ 166. My discussion in Parts I-IV of my Tate dissent is relevant to Subdiaz-Osorio, and I incorporate Parts I-IV of my Tate dissent into my Subdiaz-Osorio dissent without repeating them in full. Parts V and VI address issues found only in my Subdiaz-Osorio dissent.[31]
*126 ¶ 167. Accordingly, I dissent in both cases.
I-IV
¶ 168. Parts I-IV of my dissent in Tate constitute Parts I-IV of this dissent. In other words, I incorporate by reference Parts I-IV of the Tate dissent. See Tate, 2014 WI 89, ¶¶ 52-163 (Abrahamson, C.J., dissenting).
V
¶ 169. Law enforcement did not obtain a warrant for the defendant's cell phone location data in Subdiaz-Osorio. Warrantless searches are "per se unreasonable under the Fourth Amendment. . . ."[32] of the United States Constitution and under the Wisconsin Constitution.
¶ 170. The government bears the burden of proving by clear and convincing evidence that a warrantless search falls within one of the narrowly delineated *127 exceptions to the warrant requirement.[33] One such exception is exigent circumstances.
¶ 171. By definition, exigent circumstances justifying an exception to the warrant requirement must be exceptional; the circumstances must generate a sense of urgency. Furthermore, the particular warrantless search must be justified by weighing "the urgency of the officer's need to [search] against the time needed to obtain a warrant." State v. Richter, 2000 WI 58, ¶ 28, 235 Wis. 2d 524, 612 N.W.2d 29.
¶ 172. In order to show that an urgent situation existed and that there was no time to secure a warrant, "[t]he officer must be able to point to specific and articulable facts which, taken with rational inferences from those facts," constitute grounds to believe an emergency existed and there was a need to act.[34] Each case must be decided on its facts, not on a court's acceptance of overgeneralizations.[35]
¶ 173. The State failed to demonstrate that any of the three purported circumstances advanced by Justice Prosser's lead opinion — threat to safety, risk of destruction of evidence, and increased likelihood of flight[36]— existed with sufficient urgency to justify the privacy violation in the instant case. To get around the State's paucity of evidence in the record to support urgency, Justice Prosser's lead opinion engages in the type of *128 overgeneralizations condemned by Missouri v. McNeely, 569 U.S. _, 133 S. Ct. 1552, 1561 (2013).
¶ 174. In most criminal investigations, at least one of these three purported circumstances exist. If the mere allegation of one of these circumstances is sufficient to demonstrate exigent circumstances, an officer could simply presume exigent circumstances in most cases. Justice Prosser's lead opinion's holding allows the exigent circumstances exception to swallow the warrant requirement in the present case.
¶ 175. In addition to its failure to show urgency, the State also failed to show that there was not sufficient time to get a warrant under the circumstances.
¶ 176. Because the State failed to meet its burden to prove exigent circumstances, I dissent. Justice Bradley and Justice Crooks agree that in the instant case, the State failed to demonstrate exigent circumstances to justify an exception to the warrant requirement.[37]
A
¶ 177. In the instant case, the State entered no evidence that alleged exigencies posed the urgent threat necessary to justify the warrantless search in question.
¶ 178. Justice Prosser's lead opinion relies on three exigent circumstances: (1) "a threat to safety"; (2) "risk of destruction of evidence"; and (3) "a likelihood that [the defendant] would flee." Lead op., ¶ 76.
¶ 179. First, Justice Prosser's lead opinion states that because the murder weapon (a knife) was not recovered, "a potentially armed individual who recently committed a homicide" created a "threat to safety." Lead op., ¶ 77.
*129 ¶ 180. I agree that a threat to safety exists when an armed and dangerous suspect is at large, but not every suspect believed to be armed and dangerous poses an exigent circumstance.
¶ 181. State v. Richter, 2000 WI 58, 235 Wis. 2d 524, 612 N.W.2d 29, is instructive. In Richter, the court held that an imminent threat to safety existed when an officer knew that one home had been burglarized, had evidence that the suspect had fled to a second home, observed signs of forced entry into that home, and saw that there were people sleeping inside the second home at the time the intruder entered. Richter, 235 Wis. 2d 524, ¶ 41. This combination of factors "creat[ed] a situation fraught with potential for physical harm if something was not immediately done to apprehend the suspect." Richter, 235 Wis. 2d 524, ¶ 41 (emphasis added).
¶ 182. Conversely, in the instant case, there was no such immediate threat. The police could identify only a generalized threat that exists any time a suspect is believed to be armed and is sought on suspicion of having committed a violent offense. If exigent circumstances exist any time a suspect is armed and is under suspicion of having committed a violent offense, exigent circumstances would exist in most criminal investigations and the warrant requirement would be rendered a nullity.
¶ 183. Justice Prosser's lead opinion bases its determination that a "threat to safety" existed here on pure speculation and conjecture, repeatedly citing information that the police "had no way of knowing." Lead op., ¶ 78. The police had no way of knowing or even inferring, as Justice Prosser's lead opinion supposes, "that [the defendant] might become violent if confronted," or "how desperate [the defendant] might become to avoid apprehension." Id.
*130 ¶ 184. Second, Justice Prosser's lead opinion asserts that there was a "risk of destruction of evidence." Lead op., ¶ 76. For this proposition, Justice Prosser's lead opinion offers no reasonable or articulable facts, because none were offered by the State. Nothing in the record demonstrates an imminent threat of destruction of evidence.[38] Unlike other cases in our jurisprudence, there were no signs of evidence being destroyed,[39] or particular facts to support an officer's suspicion of the destruction of evidence.[40]
¶ 185. Third, Justice Prosser's lead opinion asserts that there was "a likelihood that [the defendant] would flee." Lead op., ¶ 76. The defendant was no longer at the scene. The police knew the following: the suspect had already fled; the suspect had family in Mexico; and the suspect had told a friend that he did not want to be arrested.
¶ 186. Criminal suspects are often no longer at the scene of a crime when law enforcement officers arrive. Criminal suspects often have family and friends in places other than the place of the crime. Criminal *131 suspects can usually access various forms of transportation. Criminal suspects rarely intend to be arrested.
¶ 187. If these facts alone are enough to justify exigent circumstances, then the rule that the State must show "particular facts" to meet its burden is rendered a nullity.
¶ 188. Beyond the sparse facts I have stated, the State makes no showing of the delay that would have occurred had the police pursued a warrant. Nor does the State make any showing that a delay, had it existed, would have had any impact on the defendant's flight. The State thus failed to show that getting a warrant would "greatly enhance the likelihood of the suspect's escape."[41]
¶ 189. Instead, using 20/20 hindsight, the lead opinion relies upon the defendant's travel time and location upon arrest to justify its assertion that there was an increased risk of flight.[42] Justice Prosser's lead opinion speculates about where the defendant went and how he could have moved after he began driving.[43] Justice Prosser wonders where the defendant could have gone, listing in great detail the transportation options available in Chicago, then noting that the defendant could have gone elsewhere as well.[44]
¶ 190. Justice Prosser's lead opinion admits that "the police could only speculate as to [the defendant's] plans or his route". Lead op., ¶ 80. Justice Prosser's lead opinion then speculates about what the police might have speculated — a tenuous chain of reasoning with no basis in fact.
*132 ¶ 191. Thus, Justice Prosser's lead opinion bases its determination that there was a greatly enhanced flight risk upon speculation about speculation, creating its own narrative and ignoring the glaring failure of the State to offer one iota of evidence that increased flight risk existed at all.
B
¶ 192. Even if we accept that there was some urgent threat created by the defendant's apparent flight with the murder weapon, the State can meet its burden to establish the exigent circumstances exception to the warrant requirement only when "there is compelling need for official action and no time to secure a warrant."[45]
¶ 193. All warrants necessarily require some amount of time to secure, but the inquiry for exigent circumstances is whether the State can demonstrate specific, articulable facts showing that the warrant process would "significantly increase" the delay before the officers can act.[46]
¶ 194. Justice Prosser's lead opinion lays out in careful detail the timeline of the events leading up to the defendant's arrest, yet it is missing any evidence about the existence of or length of a delay that would have been caused by obtaining a warrant or any evidence that such a delay would have adversely affected law enforcement's ability to act to apprehend the suspect.
¶ 195. Nothing in the record tells us why the officers, who had obtained a warrant for a search of the *133 defendant's residence, could not have obtained a warrant for the defendant's cell phone location data. In other words, there is no reason, based on the record before us, to suppose that it was impracticable for the officers to obtain a search warrant for the defendant's cell phone location data as well.[47]
¶ 196. The United States Supreme Court has recently informed us once again of the burden of proof the State must meet to fulfill the exigent circumstances exception to a warrant. McNeely, 133 S. Ct. 1552, is instructive.
¶ 197. In McNeely, the State of Missouri urged that the dissipation of alcohol in the bloodstream created a per se exigent circumstance that created an exception to the warrant requirement for a blood draw. The Court held that such a rule would be contrary to the totality-of-the-circumstances analysis that it has employed in the past and would potentially relieve the state of any burden to show the actual delay created by securing a warrant:
In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. See McDonald v. United States, 335 U.S. 451, 456, 69 S. Ct. 191, 93 L.Ed. 153 (1948) ("We cannot.. . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made [the search] imperative").
Consider, for example, a situation in which the warrant process will not significantly increase the delay before *134 the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement.
McNeely, 133 S. Ct. at 1561.
¶ 198. Thus, the burden on the State in the present case was to show that the situation made the warrantless search in question "imperative" and that securing a warrant "significantly increases" the delay before the officers can take action.
¶ 199. In the instant case, the record does not include any testimony or evidence demonstrating
• at what time the police decided to seek the defendant's cell phone location data;
• the estimated amount of time needed to obtain a warrant for the data and the duration of any delay; or
• the timeline for obtaining the data absent a warrant, i.e., at what time the law enforcement officer's request was made to the Department of Justice to obtain the cell phone location data; at what time the Department made the request of the cell phone service provider; at what time the cell phone service provider received the Department's request; at what time the cell phone service provider processed the request; and at what time the information was transmitted to Arkansas law enforcement.
¶ 200. Rather than a clear timeline of the events that demonstrates the need for a warrantless search, the record reveals only the barest of facts. Sometime between 10 a.m. and 12 p.m., while interviewing the defendant's girlfriend, the Kenosha police received the information regarding the defendant's departure in a *135 car. The police stated that their interviews, which finished around 12 p.m., established probable cause to send the temporary "want" to CIB/NCIC "within an hour and a half of obtaining information from the witnesses."
¶ 201. The record reflects that some time transpired between the time that the "want" was executed with CIB/NCIC and the time that the request for cell phone location data was made to the Wisconsin Department of Justice, which then requested the data from Sprint, the cell phone service provider. The State was not able to pinpoint the relevant times:
[PROSECUTOR]: Prior to contacting the state of Wisconsin agents for assistance, had you received any hits or any feedback or any communication back from CIB or NCIC?
[OFFICER]: No.
[PROESCUTOR]: And you indicate that at a point in time then that you contacted state agents to assist in your investigation to locate the defendant?
[OFFICER]: Yes.
[PROESCUTOR]: Do you recall what time that occurred?
[OFFICER]: I don't know the specific time. It was probably sometime after 12:00 in the afternoon.
On cross-examination, defense counsel was not able to get the officer to pinpoint the approximate time frame for the various events:
[DEFENSE COUNSEL]: And it was after you had received information from [four witnesses] that you put in the information for the Temporary Felony Worksheet, the document submitted to CIB/NCIC?
*136 [OFFICER]: I had not spoken with [one witness] before that was entered. I don't know exactly when the temporary want was entered because, like I said, I didn't do that. But it was after we had gathered enough information to establish probable cause for [the defendant],
¶ 202. After CIB/NCIC did not respond with any hits, the Kenosha police requested the defendant's location data "sometime after 12:00 p.m." The police received the data from state law enforcement "sometime in the afternoon." The information was not transmitted to Arkansas until 5:37 p.m.
¶ 203. The record does not show that any additional wait time would have resulted from obtaining a warrant. The record does not show that the time to secure a warrant would have made any demonstrable difference in the time it took to obtain the cell phone location data.
¶ 204. On the contrary, the law enforcement officers' testimony reveals the efficiency and speed of the existing system to approve warrants. When the police in the instant case sought to obtain a search warrant for the defendant's residence, it took a mere ten to fifteen minutes after the affidavit was completed for a judge to arrive. Within half an hour of the judge's arrival, the search warrant was approved. From the time the police began working on the affidavit for a search warrant for the defendant's residence until the warrant was approved, a maximum of an hour and a half had elapsed.
¶ 205. On this record, the State cannot meet its burden to demonstrate that the time to secure a warrant would significantly delay, or indeed, delay at all, the disclosure of the defendant's cell phone location data or the apprehension of the defendant.
*137 ¶ 206. In sum, the State failed to carry its burden of proof. Through conjecture and speculation, the lead opinion fills in the many blanks of key facts missing from the record.
¶ 207. The lead opinion's exigent circumstances exception swallows the rule of the warrant requirement. According to Justice Prosser's lead opinion's reasoning, almost every criminal investigation presents exigent circumstances.
¶ 208. I decline to undercut the warrant requirement or ignore the heavy burden placed on the State to prove the exigent circumstances exception to the warrant requirement.
VI
¶ 209. I turn at last to the issue of the defendant's invocation of his right to counsel. The key holding of Miranda v. Arizona[48] was straightforward: "If [an] individual states that he [or she] wants an attorney, the interrogation must cease until an attorney is present."[49]
¶ 210. Justice Prosser's lead opinion requires a suspect to make an "unequivocal invocation" of the right to counsel. This test stems from Davis v. United States, 512 U.S. 452 (1994).
¶ 211. The Davis "unequivocal" or "unambiguous" invocation test has been heavily criticized on a number of grounds, including that the "unequivocal" test invites equivocation on the part of courts — identical statements appear "unequivocal" to one court but "equivocal" to another.[50] In applying the "unequivocal invocation" *138 test, courts have "rejected as ambiguous an array of statements whose meaning might otherwise be thought plain."[51]
¶ 212. Davis requires a court to make an objectively reasonable analysis of the circumstances to determine whether an individual's request for a lawyer is *139 ■unequivocal. The defendant need evince only "a certain and present desire to consult with counsel" to invoke the right. United States v. Hunter, 708 F.3d 938, 942 (7th Cir. 2013). Courts are required "to evaluate a defendant's request as ordinary people would understand it, and to give a broad, rather than a narrow, interpretation to a defendant's request for counsel." Hunter, 708 F.3d at 942 (internal quotation marks and citations omitted).[52]
¶ 213. In the instant case, the defendant said, "How can I do to get an attorney here because I don't have enough to afford for one" (emphasis added).
¶ 214. An ordinary reasonable person, looking at the defendant's statement, would understand the defendant to be making a request for a lawyer. The defendant is saying he cannot afford an attorney and wants to know how to get an attorney at that place and time.
¶ 215. Justice Prosser's lead opinion ignores the broad interpretation of the defendant's words. Instead, Justice Prosser's lead opinion gives them a narrow interpretation, squinting hard at the record, searching for ambiguity or equivocation where a reasonable person would find none. Lead op., ¶¶ 86-87.
¶ 216. Justice Prosser's lead opinion focuses on the discussion of extradition to twist the defendant's *140 request for a lawyer into a request for counsel at the extradition hearing. Lead op., ¶ 86-87. Justice Prosser's lead opinion claims that the officer had "just explained the extradition process to [the defendant]," which made it reasonable for the officer to infer that "here" meant "at the extradition hearing." Lead op., ¶ 87.
¶ 217. Here is what happened: The officer interrogating the defendant described the extradition hearing ("What happens is that you have to appear in front of a judge here in Arkansas then they will find out if there is enough reason to send you back to Kenosha"). But then, the officer added, "But we are not going to do that right now. We are not going to know that right now" (emphasis added).[53] The officer made clear that the extradition hearing was no longer the subject of conversation.
¶ 218. It is not objectively reasonable to assume that the defendant used the word "here" to mean anything other than its generally understood definition. The word "here" is generally intended to mean "in or at this place or time." A reasonable person would not understand "here" to mean "at some later point in time." What was happening "here"? The interrogation. To a *141 reasonable person, the defendant is saying that he wants a lawyer and wants a lawyer at the interrogation.
¶ 219. Justice Prosser's lead opinion requires the defendant to speak with the discrimination of an Oxford don[54] and to use an "exact formula" or "magic words"[55] to invoke the right to counsel. That's not the law.
% H* H4
¶ 220. In sum, for the reasons stated, I conclude that in the instant case the State failed to meet its burden of demonstrating the existence of exigent circumstances. I further conclude that Subdiaz-Osorio invoked his Miranda right to an attorney at his interrogation.
¶ 221. For the foregoing reasons and the reasons stated in my dissent in Tate, 2014 WI 89, ¶¶ 52-165 (Abrahamson, C.J., dissenting), I dissent.

 State v. Earls, 70 A.3d 630, 631-32 (N.J. 2013).

 State v. Tate, 2014 WI 89, 357 Wis. 2d 172, 849 N.W.2d 798.

 State v. Subdiaz-Osorio, 2014 WI 87, 357 Wis. 2d 41, 849N.W.2d 748.

 The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

 Article 1, Section 11 of the Wisconsin Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

 Riley v. California, 134 S. Ct. 2473, 2484 (2014).

 Earls, 70 A.3d at 638.

 Riley, 134 S. Ct. at 2484. The Riley Court additionally noted that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower." Id. at 2490.

 See Earls, 70 A.3d at 632. See also Riley, 134 S. Ct. at 2489 ("Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. ... [Cell phones] could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.").

 See Noam Cohen, It's Tracking Your Every Move and You May Not Even Know, N.Y. Times, Mar. 26, 2011, at Al.

 Riley, 134 S. Ct. at 2490 (citing United States v. Jones, 132 S. Ct. 945 (2012) (Sotomayor, J., concurring)).

 "[W]e promote clarity in the law of search and seizure and provide straightforward guidelines to governmental officers who must apply our holdings." State v. Williams, 2012 WI 59, ¶ 25, 341 Wis. 2d 191, 814 N.W.2d 460.

 Justices Ann Walsh Bradley and N. Patrick Crooks agree with this conclusion.

 "To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication." Katz v. United States, 389 U.S. 347, 352 (1967).

 See, e.g., United States v. Davis, 754 F.3d 1205, 2014 WL 2599917, at *9 (11th Cir. 2014) ("[I]t is unlikely that cell phone customers are aware that their cell phone providers collect and store historical location information.") (quoting In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. To Disclose Records to Gov't, 620 F.3d 304, 317 (3d Cir. 2010)); Earls, 70 A. 3d at 632.

 State v. Sanders, 2008 WI 85, ¶ 27, 311 Wis. 2d 257, 752 N.W.2d 713; State v. Payano-Roman, 2006 WI 47, ¶ 30, 290 Wis. 2d 380, 714 N.W.2d 548.

 I refer to the court order issued in Tate as a "warrant," as does the Tate majority opinion. The applicable statute refers to a court issuing a "subpoena" requiring the production of documents. Wis. Stat. § 968.135.

 "Privacy comes at a cost." Riley, 134 S. Ct. at 2493.

 Tate, 2014 WI 89, ¶¶ 2, 26; Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 9, 70 (Prosser, J., lead op.). But see Subdiaz-Osorio, Justice Roggensack's concurrence, ¶ 132 (accusing Justice Prosser's lead opinion of not merely assuming the issue of the reasonable expectation of privacy but in effect deciding the issue).

 See Riley, 134 S. Ct. 2473 (cited in Tate, 2014 WI 89, ¶ 20 n.11; in Subdiaz-Osorio, Justice Prosser's lead op., ¶ 47 n.23); Katz, 389 U.S. at 353 (cited in Tate, 2014 WI 89, ¶¶ 19-21; in Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 51-52, 65-66; in Subdiaz-Osorio, Justice Roggensack's concurrence, ¶ 132); Jones, 132 S. Ct. 945 (2012) (cited in Tate, 2014 WI 89, ¶¶ 17-25; in Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 43, 48, 51; in Subdiaz-Osorio, Justice Roggensack's concurrence, ¶ 135; State v. Brereton, 2013 WI 17, 345 Wis. 2d 563, 826 N.W.2d 369 (cited in Tate, 2014 WI 89, ¶¶ 16-18, 40; in Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 38, 49; State v. Sveum, 2010 WI 92, 328 Wis. 2d 369, 787 N.W.2d 317 (cited in Tate, ¶¶ 14, 23, 28, 30, 40-43; in Subdiaz-Osorio, Justice Prosser's lead op., ¶ 49).

 See Subdiaz-Osorio, Justice Roggensack's concurrence, ¶¶ 131-132 (criticizing Justice Prosser's lead opinion for "elaborate[ing] too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear"); Subdiaz-Osorio, Justice Prosser's lead op., ¶ 50 (noting that Tate shares similarities with Subdiaz-Osorio even though it is ultimately decided on other issues).

 In footnotes 23 through 30,1 consolidate and summarize the position of each opinion in Tate and Subdiaz-Osorio regarding particular topics.

 For discussions of whether a search existed, see:
Tate, 2014 WI 89, ¶ 26: Assumes, without deciding, that there was a search.
Subdiaz-Osorio, Justice Prosser's lead op., ¶ 9: Assumes, without deciding, that there was a search but hints strongly that a search existed.
Subdiaz-Osorio, Justice Bradley's concurrence, ¶ 89; Justice Crooks' concurrence, ¶ 116: Determine that there was a search.
Subdiaz-Osorio, Justice Roggensack's concurrence, ¶¶ 131-137: Criticizes Justice Prosser's lead opinion for elaborating too fully on right to privacy in cell phone location data.
Subdiaz-Osorio, Justice Ziegler's concurrence, ¶ 139-143: Joining Justice Roggensack's concurrence, and requesting additional briefing on whether a search existed.
Tate, 2014 WI 89, ¶ 61 (Abrahamson, C.J., dissenting): Yes, access to cell phone location data is a search. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶ 155.

 For discussions of whether a trespass existed, see:
Tate, 2014 WI 89, ¶¶ 18-20: Discusses trespass but refers to the search only as "nontrespassory."
Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 48-50: Trespass analysis would be "unnatural."
*123 Tate, 2014 WI 89, ¶¶ 101-102 (Abrahamson, C.J., dissenting): State does not disclose how information was obtained; appears to be a trespass. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶ 168.

 For discussions of whether the cell phone contract created consent to access the cell phone location data, see:
Tate, 2014 WI 89, ¶ 22: Defendant might consent through purchase of cell phone.
Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 53-63: Consent through cell phone purchase contract was invalid.
Subdiaz-Osorio, Justice Roggensack's concurrence, ¶¶ 133-135: Questions Justice Prosser's lead opinion regarding contract.
Tate, 2014 WI 89, ¶¶ 116-121 (Abrahamson, C.J., dissenting): Adhesion contract will not be enforced to waive constitutional rights. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶ 168.

 For discussions of the impact of third-party doctrine, see:
Tate, 2014 WI 89, ¶¶ 24-25: Third-party doctrine may need reevaluation.
Subdiaz-Osorio, Justice Roggensack's concurrence, ¶ 134-135: Questions whether expectation of privacy exists in third-party records.
Tate, 2014 WI 89, ¶ 122-135, (Abrahamson, C.J., dissenting): Third-party doctrine in inapplicable to cell phone location data.

 For discussions of whether society recognizes a reasonable expectation of privacy, see:
Tate, 2014 WI 89, ¶¶ 2,16-25: Expectation of privacy may be lower for cell phone location, especially in a public area; expectation of privacy was dependent on the cell phone's location in a home.
*124 Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 65-68: Public expects privacy in cell phone location data and worries about invasion of privacy.
Subdiaz-Osorio, Justice Roggensack's concurrence, ¶¶ 134-135: Questions whether expectation of privacy exists in third-party records.
Tate, 2014 WI 89, ¶ 136-149 (Abrahamson, C.J., dissenting): Case law, public policy, and Wisconsin legislation point to society recognizing reasonable expectation of privacy in cell phone location data. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶ 168.

 For discussions of the warrant requirement, see:
Tate, 2014 WI 89, ¶¶ 33-50: Warrant did not comply with Wis. Stat. § 968.135, subpoena for third-party information. Non-statutory warrant met constitutional requirements. Non-statutory warrants met "spirit" of warrant statutes.
Subdiaz-Osorio, Justice Prosser's lead op., ¶ 5 n.2: No warrant at issue, but warrants must meet Fourth Amendment and statutory requirements.
Subdiaz-Osorio, Justice Bradley's concurrence, ¶ 89: A warrant was needed and the State's warrant failed to comply in either case.
Subdiaz-Osorio, Justice Crooks' concurrence, ¶ 118: A warrant was needed but the good-faith exception applied.
Tate, 2014 WI 89, ¶¶ 150-163 (Abrahamson, C.J., dissenting): State fails to comply with statutory warrant requirements. Warrant was invalid. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶ 168.

 For discussions of exigent circumstances, see:
*125 Tate: Exigent circumstances not at issue.
Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 69-81: Exigent circumstances exception to warrant requirement was satisfied.
Subdiaz-Osorio, Justice Bradley's concurrence, ¶ 89: there were no exigent circumstances.
Subdiaz-Osorio, Justice Crooks' concurrence, ¶ 118: there were no exigent circumstances.
Subdiaz-Osorio, Justice Roggensack's concurrence, ¶ 130: Law enforcement acted reasonably under the Fourth Amendment due to exigent circumstances.
Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶ 169-208: State fails to meet its burden to show exigent circumstances.

 For discussions of the Miranda right to an attorney, see:
Tate: Miranda rights not at issue.
Subdiaz-Osorio, Justice Prosser's lead op., ¶¶ 82-87: Defendant failed to invoke unequivocally right to an attorney.
Subdiaz-Osorio, Justice Bradley's concurrence, ¶ 89: Defendant successfully invoked Miranda right.
Subdiaz-Osorio, Justice Crooks' concurrence, ¶ 109; Justice Roggensack's concurrence, ¶ 130: Defendant failed to invoke unequivocally right to an attorney.
Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶¶ 209-219: A reasonable person would understand Subdiaz-Osorio to have invoked his Miranda right.

 The two cases raise numerous additional issues that I do not address, including the applicability of federal statutes, the *126 good-faith exception, and the proper standard for reviewing and remedying an illegal search of cell phone location data.
Justice Crooks' concurrence in Subdiaz-Osorio asserts that an illegal warrantless search occurred, Justice Crooks' concurrence, ¶¶ 125-128, but that the good-faith exception applies, and that the evidence should not have been excluded. As I explain in Parts I-iy our state's case law already set forth the need for a warrant and the statutes provide procedures for obtaining a warrant. These rules of law existed at the time that the officers initiated the search in the instant cases.
I am unconvinced that the usual harmless-error analysis is the proper approach in Tate and Subdiaz-Osorio. See Subdiaz-Osorio, Justice Bradley's concurrence, ¶¶ 97-105 (applying harmless-error analysis in Subdiaz-Osorio). When illegally obtained cell phone location data forms the entire basis for the apprehension and arrest of the defendant, rather than evidence of the crime, the usual harmless-error analysis appears to be a poor fit.

 Sanders, 311 Wis. 2d 257, ¶ 27.

 Payano-Roman, 290 Wis. 2d 380, ¶ 30; State v. Kieffer, 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998).

 3 Wayne R. LaFave, Search and Seizure, § 6.6(a), at 599 (5th ed. 2013) (citation and quotations omitted).

 Missouri v. McNeely, 569 U.S. , 133 S. Ct. 1552, 1561 (2013) (citing Richards v. Wisconsin, 520 U.S. 385, 393 (1997) (blanket rules cannot be used to justify a lack of a warrant)).

 Lead op., ¶ 76.

 See Justice Bradley's concurrence, ¶ 89; Justice Crooks' concurrence, ¶ 118.

 See McNeely, 133 S. Ct. at 1559 ("[I]n some circumstances law enforcement officers may conduct a search without a warrant to prevent the imminent destruction of evidence.") (emphasis added); id. at 1569 (Roberts, C.J., concurring, joined by Breyer, J. & Alito, J.) ("[The exigent circumstances exception] applies when there is a compelling need to prevent the imminent destruction of important evidence, and there is no time to obtain a warrant.") (emphasis added).

 See, e.g., State v. Hughes, 2000 WI 24, ¶ 26, 233 Wis. 2d 280, 607 N.W.2d 621; State v. Robinson, 2010 WI 80, ¶ 31, 327 Wis. 2d 302, 786 N.W.2d 463 (in which such signs appeared).

 See State v. Meyer, 216 Wis. 2d 729, 751-53, 576 N.W.2d 260 (1998) ("[P]articular facts must be shown in each case to support an officer's reasonable suspicion that exigent circumstances exist.").

 Lead op., ¶ 79 (citing Hughes, 233 Wis. 2d 280, ¶ 24) (emphasis added).

 Id., ¶¶ 80-81

 Id., ¶ 80.

 Id.

 McNeely, 133 S. Ct. at 1559 (citing Michigan v. Tyler, 436 U.S. 499, 509 (1978)); id. at 1570 (Roberts, C.J., concurring, joined by Breyer, J. & Alito, J.) (same).

 Id. at 1561.

 Vale v. Louisiana, 399 U.S. 30, 35 (1970).

 Miranda v. Arizona, 384 U.S. 436 (1966).

 Miranda, 834 U.S. at 474.

 Compare United States v. Martin, 664 F.3d 684 (7th Cir. 2011) (invocation was unequivocal when defendant said "I'd *138 rather talk to an attorney first before I do that") with Delashmit v. State, 991 So. 2d 1215 (Miss. 2008) (invocation was equivocal when defendant said "I prefer a lawyer"). Compare also Wood v. Ercole, 644 F.3d 83 (2d Cir. 2011) (invocation was unequivocal when defendant said "I think I should get a lawyer") with Commonwealth v. Morganti, 917 N.E.2d 191 (Mass. 2009) (invocation was equivocal when defendant said he was "thinking I might need a lawyer and want to talk to him before talking to you").

 Berghuis v. Thompkins, 560 U.S. 370, 410-11 & n.9 (Sotomayor, J., dissenting). Justice Sotomayor cites a variety of cases in the context of invocations of the Miranda right to remain silent in which courts have applied the test subjectively.
As Marcy Strauss notes in her empirical overview of cases regarding the application of the "unequivocal invocation" rule, courts apply their own subjective spin to a purportedly objective test:
[TJhe evidence suggests gross inconsistencies in the approaches of the courts. Some courts deem seemingly clear demands as ambiguous. Yet in other cases, virtually identical language is treated differently in ways inexplicable by the context. It is drastically unfair that a suspect in one jurisdiction who says, "I think I would like to talk to my attorney," can be ignored, while a similar statement in another jurisdiction is treated as invoking Edwards. It makes no logical sense whatsoever that the police may continue questioning a suspect who says, "Can I call my lawyer?" in one station house, while in another one the comment, "Can I have my lawyer present when [I tell you my story]?" is deemed an invocation of rights requiring the cessation of questions. Such contradictory results are not only unfair, they are pernicious.
Marcy Strauss, Understanding Davis v. United States, 40 Loy. L.A. L. Rev. 1011, 1061-62 (2007) (footnotes and citations omitted).

 "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis, 512 U.S. at 459 (citations & internal quotation marks omitted).
In United States v. Hunter, 708 F.3d 938 (7th Cir. 2013), the court held that the defendant's asking "Can you call my attorney?" while giving the officer the name of the attorney constituted an unequivocal invocation of the right to an attorney.

 The relevant portion of the interrogation was transcribed by the circuit court as follows:
[POLICE OFFICER]: We aren't going to take you back to Kenosha. What happens is that you have to appear in front of a judge .... And after you appear in front of a judge here in Arkansas then they will find out if there is enough reason to send you back to Kenosha, . . . but we are not going to do that right now. We are not going to know that right now ....
[DEFENDANT]: How can I do to get an attorney here because I don't have enough to afford for one.

 Davis, 512 U.S. at 459.

 United States v. Lee, 413 F.3d 622, 625 (7th Cir. 2005) ("[Tjhere is no exact formula or magic words for an accused to invoke his [or her] right.").