PATIENCE DRAKE ROGGENSACK, J.
¶ 1. We review an unpublished decision of the court of appeals[1] affirming the decision of the Milwaukee County Circuit Court[2] denying defendant Bobby L. Tate's motion to suppress evidence that law enforcement obtained by tracking Tate's cell phone using cell site location information ("cell site information") and a stingray. Before tracking Tate's cell phone, law enforcement obtained an order approving the use of a pen register/trap and trace device and the release of certain subscriber informa *178 tion, such as cell tower activity and location information. Tate argues that law enforcement violated his right against unreasonable searches under both the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution and that the order authorizing the tracking of his cell phone required statutory authority, which it lacked.
¶ 2. In evaluating Tate's argument, we assume without deciding that: (1) law enforcement's activities constituted a search within the meaning of the Fourth Amendment and Article I, Section 11; and (2) because the tracking led law enforcement to discover Tate's location within his mother's home, a warrant was needed. We then conclude that the search was reasonable because it was executed pursuant to an order[3] that met the Fourth Amendment's and Article I, Section ll's requirements. See State v. Higginbotham, 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991). We also conclude that specific statutory authorization was not necessary for Milwaukee County Circuit Court Judge Jeffrey Wagner to issue the order that authorized the procedures used to track Tate's cell phone because the order was supported by probable cause. Nonetheless, the order did comply with the spirit of Wis. Stat. § 968.12 and Wis. Stat. § 968.135 (2009-10),[4] the search warrant and criminal subpoena statutes, which express legislative *179 choices about procedures to employ for warrants and criminal subpoenas.[5] Accordingly, we affirm the decision of the court of appeals.
I. BACKGROUND
¶ 3. On the evening of June 9, 2009, law enforcement responded to a homicide outside of Mother's Foods Market/Magic Cell Phones at 2879 N. 16th Street in Milwaukee. Upon arrival, officers found a victim lying between the curb and the sidewalk with a fatal gunshot wound to the head. A second victim was taken to the hospital to receive treatment for a gunshot wound to his left ankle.
¶ 4. Witnesses described the shooter as a black male wearing a striped polo shirt. Footage from Mother's Foods' surveillance camera showed a person matching the suspect's description purchase a prepaid cellular phone inside the store, leave the store and shoot the victim in the back of the head. The clerk who sold the phone to the suspect told police that the suspect identified himself to her as "Bobby" and said that he had just gotten out of prison that day.
¶ 5. Mother's Foods provided police with information about the phone the suspect purchased, including the telephone number assigned to the phone. Detective Patrick Pajot used two internet databases to confirm that US Cellular was the service provider for that phone.
*180 ¶ 6. Upon these facts, which Detective Pajot described in a sworn affidavit, Assistant District Attorney Grant Huebner applied for an order approving the following: (1) installation and use of a trap and trace device or process; (2) installation and use of a pen register device or process; and (3) the release of subscriber information, including cell tower activity and location and global positioning system (GPS) information that could identify the physical location of the target phone.[6]
¶ 7. Officer Brian Brosseau of the Milwaukee County's Intelligence Fusion Division testified at the suppression hearing about the technology officers ultimately used to locate the suspect's phone, which included cell site information[7] and a *181 stingray.[8] Cell site information allows law enforcement to locate a cell phone by triangulation. The Collection and Use of Location Info, for Commercial Purposes: J. Hearing Before the Subcomm. on Commerce, Trade, and Consumer Prot. and Subcomm. on Commc'ns, Tech., and the Internet of the H. Comm, on Energy and Commerce, 111th Cong. 34, 36 (2010) (statement of Lorrie Faith Cranor, Assoc. Professor of Computer Science and of Engineering & Public Policy, Carnegie Mellon University). Any time a cell phone is turned on, it is searching for a signal and, in the process, identifying itself with the nearest cell tower every seven seconds. ECPA Reform and the Revolution in Location Based Tech, and Servs.: Hearing Before the Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the H. Comm, on the Judiciary, 111th Cong. 17, 20-21 (2010) (statement of Matt Blaze, Associate Professor, University of Pennsylvania); In Re Application for Pen Register & Trap/Trace Device with Cell Site Location *182 Auth. 396 F. Supp. 2d 747, 750 (S.D. Tex. 2005). Cell service providers can "collect data from th[e]se contacts, which allows [them] to locate cell phones on a real-time basis and to reconstruct a phone's movement from recorded data." State v. Earls, 70 A.3d 630, 632 (N.J. 2013).
¶ 8. It is not clear from the record exactly how law enforcement used cell site information in the present case. We do not know whether US Cellular or law enforcement triangulated the signals from the target phone. We also do not know whether US Cellular regularly collects this information, or if it did so solely at law enforcement's request. Officer Brosseau explained only that, "[w]e were receiving information with the cell tower information, what that cell tower is currently on" and that, as a general matter, "the cell phone provider ... send[s] us data regarding a certain number... [pen] register[9] information on that particular phone number." He stated that the phone signal "was bouncing between three different cell phone towers on three different sectors which if you were to map it out were to give you an angle or an area of probability of where you believe the suspect would be ... at that time."
¶ 9. After law enforcement received cell site information from US Cellular, officers used a stingray to further narrow down the phone's location. The stingray, *183 a device that mimicked a cell tower, allowed officers to locate the phone based on signal strength. See Jennifer Valentino-DeVries, "Stingray" Phone Tracker Fuels Constitutional Clash, Wall Street Journal, Sept. 22, 2011, available at http://online.wsj.com/news/ articles/ SB100014240531119041946045765831127231 97574 (last visited July 3, 2014). Officer Brosseau explained that law enforcement's stingray is a "directional antenna mounted on our vehicle which will respond only to that electronic serial number of which we're looking for and it will give [us] an arrow, if you will, pointing to the direction and with the strength tell [us] how close [we] are to that particular electronic." Using the stingray, officers "could tell [the target phone] was on the... south and east side" of a particular apartment building on the 5700 block of West Hampton Avenue.
¶ 10. At that point, officers entered the apartment building and began knocking on the doors of individual apartments on the southeast side of the building. After searching the apartments of three or four residents and not locating what they were looking for, officers knocked on the door of the defendant's mother, Doris Cobb.
¶ 11. Officers entered[10] Cobb's apartment and asked her if Bobby was there. She told them he was, and pointed toward his bedroom. Officers found the defen *184 dant sleeping in the back bedroom, along with a striped polo shirt and a tennis shoe that appeared to have blood on it and the cell phone. They arrested Tate for first-degree intentional homicide.
¶ 12. Tate moved to suppress the evidence seized pursuant to the order to track his cell phone, including the items seized from his mother's apartment, statements from people in the apartment building, and statements Tate made after his arrest. Tate argued that law enforcement needed a search warrant to track Tate's phone and that Judge Wagner's order was not the equivalent of a search warrant.
¶ 13. The circuit court denied the motion to suppress, concluding that Judge Wagner's order was sufficient to allow law enforcement to track Tate's phone to the apartment building and that Cobb consented to a search of the apartment. Tate pled no contest to first-degree reckless homicide, but appealed the suppression decision. The court of appeals affirmed the conviction, concluding that Judge Wagner had a "substantial basis for finding probable cause to issue the order to locate Tate's cell phone." We agree and now affirm the decision of the court of appeals.
II. DISCUSSION
A. Standard of Review
¶ 14. We independently review "whether police conduct violated the constitutional guarantee against unreasonable searches," which presents a question of constitutional fact. State v. Arias, 2008 WI 84, ¶ 11, 311 Wis. 2d 358, 752 N.W.2d 748 (quoting State v. Griffith, 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72). *185 However, we review a warrant-issuing magistrate's determination of whether the affidavit in support of the order was sufficient to show probable cause with "great deference." Higginbotham, 162 Wis. 2d at 989. A warrant-issuing magistrate's determination of probable cause will be affirmed unless the facts asserted in support of the warrant are clearly insufficient to support probable cause. Id. We also independently determine whether "the language of a court order satisfies the requisite constitutional requirements of a warrant." State v. Sveum, 2010 WI 92, ¶ 17, 328 Wis. 2d 369, 787 N.W.2d 317.
¶ 15. And finally, in addressing Tate's argument that the circuit court lacked statutory authority to issue the order, we interpret and apply Wis. Stat. § 968.12 and Wis. Stat. § 968.135. Statutory interpretation and application present questions of law for our independent review. Richards v. Badger Mut. Ins. Co., 2008 WI 52, ¶ 14, 309 Wis. 2d 541, 749 N.W.2d 581. In so doing, we benefit from the discussions of both the court of appeals and the circuit court, just as we do with other questions of law. Marder v. Bd. of Regents of the Univ. of Wis. Sys., 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110.
B. Search
¶ 16. Tate compares cell phone tracking technology to the GPS tracking device that we examined in State v. Brereton, 2013 WI 17, ¶ 34, 345 Wis. 2d 563, 826 N.W.2d 369. He contends that tracking a cell phone through cell site information and a stingray involves a similar "usurpation of an individual's property" and therefore constitutes a search. Id.
*186 ¶ 17. In Brereton, we concluded that the law enforcement officers who placed a GPS device on a defendant's car and monitored his movements in order to conduct surveillance "invad[ed] privacy interests long afforded, and undoubtedly entitled to, Fourth Amendment protection" when they used his property without his permission. Id. (quoting United States v. Jones, 132 S. Ct. 945, 954 (2012) (Sotomayor, J., concurring)).
¶ 18. When the United States Supreme Court analyzed a similar physical placement of a GPS device on a defendant's car, it did so in terms of trespass. Jones, 132 S. Ct. at 947. In Brereton, we noted that tracking through the use of a GPS device attached to a defendant's car may have constituted a search "even in the absence of a trespass." Brereton, 345 Wis. 2d 563, ¶ 34 (quoting Jones, 132 S. Ct. at 954-55 (Sotomayor, J., concurring)).
¶ 19. We reiterated that to determine whether a search occurs when law enforcement uses tracking technology to which a physical trespass on a defendant's property does not apply, we apply the test set forth in Katz v. United States, 389 U.S. 347 (1967), which asks whether "the government violates a subjective expectation of privacy that society recognizes as reasonable." Brereton, 345 Wis. 2d 563, ¶ 34 (quoting Jones, 132 S. Ct. at 954-55) (further citation omitted).
¶ 20. The issue of whether tracking through cell site information and a stingray "violates a subjective expectation of privacy that society recognizes as reasonable" is not before us because the State has conceded, and therefore has not briefed, whether such tracking is a search within the meaning of the Fourth Amendment.[11] *187 Still, we briefly take stock of the doctrines that inform our search analysis and note several challenges in applying them to the technology at issue in this case.
¶ 21. First, analyzing whether surveillance using cell site information constitutes a search under Katz can become quite circular. That is, "the same technological advances that have made possible nontrespassory surveillance techniques . . . also affect the Katz test by shaping the evolution of societal privacy expectations." Jones, 132 S. Ct. at 955 (Sotomayor, J., concurring); Jones, 132 S. Ct. at 963 (Alito, J., concurring) ("phone-location-tracking services [that] are offered as 'social' tools . . . shape the average person's expectations about the privacy of his or her daily movements").
¶ 22. Second, it is unclear how the notion that a purchaser accepts goods as they come to him, including whether the goods can be traced electronically in real time, should impact such an analysis. Jones, 132 S. Ct. at 952; see United States v. Karo, 468 U.S. 705, 712-13 (1984) (defendant was not entitled to object to law enforcement's tracking of a can of ether because the tracking device, a beeper, was placed in the can before it belonged to the defendant).
*188 ¶ 23. Further complicating the matter is the location of the cell phone. For example, when law enforcement contemplates tracking a cell phone, they may not know whether the phone is located in a private residence, which stands at the "very core" of the Fourth Amendment, or is traveling down a public highway, in which case a defendant may have no expectation of privacy in his movements. Kyllo v. United States, 533 U.S. 27, 31 (2001) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)); United States v. Knotts, 460 U.S. 276, 281 (1983) ("A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."); Sveum, 328 Wis. 2d 369, ¶ 79 (Ziegler, J., concurring) ("installing and monitoring a GPS tracking device on a vehicle in a public area does not constitute a search or seizure within the meaning of the Fourth Amendment").
¶ 24. Finally, even movements in public areas can reveal highly personal information such as "familial, political, professional, religious, and sexual associations," which if monitored too closely, may "chill[] associational and expressive freedoms." Jones, 132 S. Ct. 955-56 (Sotomayor, J., concurring.)
¶ 25. At a minimum, it seems that to successfully argue that one has a reasonable expectation of privacy in cell site information requires a reexamination of "the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." Id. at 957 (Sotomayor, J., concurring).[12] Cases in which the United States Supreme Court asked *189 not what information a hypothetical third person could obtain but rather, what a person generally expects from third parties show that third party doctrine, even in its current state, has permutations.[13]
¶ 26. We are mindful that courts should "proceed with care when considering the whole concept of privacy expectations in communications made on electronic equipment" and that "[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear." City of Ontario, Cal. v. Quon, 560 U.S. 746, 759 (2010). For that reason and because the parties do not dispute that a search occurred, we assume, without deciding, that tracking a cell phone using cell site information and a stingray constitutes a search that has constitutional implications.
*190 C. Reasonableness of the Search
¶ 27. The Fourth Amendment of the United States Constitution[14] and Article I, Section 11 of the Wisconsin Constitution[15] protect persons from "unreasonable searches" and establish the manner in which warrants shall issue. State v. Henderson, 2001 WI 97, ¶ 17 & n.4, 245 Wis. 2d 345, 629 N.W.2d 613.[16] "Searches made without warrants issued pursuant to the requirements of the warrant clause are presumed to be unconstitutional." Id., ¶ 19.
¶ 28. As to searches made pursuant to a warrant, they pass constitutional muster if they comply with the three requirements of the Warrant Clause of the Fourth Amendment:
*191 (I) prior authorization by a neutral, detached magistrate; (2) a demonstration upon oath or affirmation that there is probable cause to believe that evidence sought will aid in a particular conviction for a particular offense; and (3) a particularized description of the place to be searched and items to be seized.
Sveum, 328 Wis. 2d 369, ¶ 20.
¶ 29. The first requirement "interposes[s] the impartial judgment of a [neutral] officer between the citizen and the police and also between the citizen and the prosecutor, so that an individual may be secure from an improper search." Id., ¶ 21 (quoting State ex rel. White v. Simpson, 28 Wis. 2d 590, 598, 137 N.W.2d 391 (1965)).
¶ 30. The second requirement provides that the person seeking a warrant demonstrate upon oath or affirmation sufficient facts to support probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction for a particular offense." Henderson, 245 Wis. 2d 345, ¶ 19 (quoting Dalia v. United States, 441 U.S. 238, 255 (1979)) (internal quotation marks omitted).[17] Finally, the third requirement focuses on the place to be searched and requires that it be identified with particularity, in addition to the items to be seized. Id. In the event that a search warrant does not comply with these requirements, we may invoke the exclusionary rule if no exception to the warrant requirements applies. Sveum, 328 Wis. 2d 369, ¶ 31 & n.8.
*192 D. Application
¶ 31. Tate argues that law enforcement officers performed an illegal search when they tracked his cell phone using cell site information and a stingray because the tracking constituted a search that violated the Fourth Amendment of the United States Constitution and Article I, Section 1 of the Wisconsin Constitution and because Judge Wagner "lacked statutory authority to issue an order authorizing police to track Tate's phone in real time." This latter contention implies that statutory authority is necessary to the lawful issuance of a warrant.
¶ 32. In regard to the latter contention, Tate also asserts that the statutes Judge Wagner cited, Wis. Stat. § 968.35, Wis. Stat. § 968.36, 18 U.S.C. §§ 2703, 2711, 3117, 3125, and 3127, did not grant the court the power to authorize law enforcement to obtain location data through cell site information or a stingray, either individually or collectively.[18]
*193 1. Constitutional sufficiency
¶ 33. To be constitutionally sufficient, a warrant must be based on probable cause and be reasonable both in its issuance and in its execution. Henderson, 245 Wis. 2d 345, ¶¶ 18-20. The warrant we review was based on the affidavit of Detective Pajot, who described sufficient facts to support probable cause to believe that the cell phone site information law enforcement sought would aid in "a particular apprehension or conviction for a particular offense." Id., ¶ 19 (quoting Warden v. Hayden, 387 U.S. 294, 307 (1967)) (internal quotation marks omitted).
¶ 34. Judge Wagner was told that a surveillance video made at the time of a homicide captured a person wearing a distinctive shirt, who identified himself to a store clerk as "Bobby" when he purchased a cell phone. He also was told that, moments later, surveillance video captured a person matching that physical description shooting two people outside the store. Finding the cell phone the suspect purchased could be probative that the *194 person in possession of the phone was the shooter. Tate has not established that the facts before the circuit court were clearly insufficient to support a determination of probable cause. See id.; Higginbotham, 162 Wis. 2d at 989.
¶ 35. In regard to Tate's complaint that Detective Pajot, Assistant District Attorney Huebner and Judge Wagner did not address why the cell phone constituted evidence of a crime, neither the Fourth Amendment nor our decisions require the person seeking a warrant to explain why a particular object or information constitutes evidence. Higginbotham, 162 Wis. 2d at 989.
¶ 36. Starting with Assistant District Attorney Huebner's application for the order and the order itself, the standard is whether the warrant-issuing magistrate is "apprised of sufficient facts to excite an honest belief in a reasonable mind that the objects sought are linked with the commission of a crime, and that the objects sought will be found in the place to be searched." State v. Starke, 81 Wis. 2d 399, 408, 260 N.W.2d 739 (1978). In keeping with this standard, our decisions have focused on the sufficiency of the evidence, not the legal arguments of the applicant or the reasoning of the magistrate. E.g., State v. Kerr, 181 Wis. 2d 372, 380-81, 511 N.W.2d 586 (1994) (although the supporting affidavit contained "minimal factual basis to support probable cause," we upheld a determination of probable cause based on the "veracity and basis of knowledge of persons supplying . . . information").
¶ 37. As to Detective Pajot's affidavit, we have described the responsibilities of an affiant seeking a warrant as follows:
*195 [Affidavits for search warrants!] ... must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.... Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner.
Higginbotham, 162 Wis. 2d at 991-92 (quoting Starke, 81 Wis. 2d at 410) (further citation omitted).
¶ 38. Although we do not require an affiant to provide legal theories, we do require a narration of sufficient facts and a statement upon what basis such a narration is made. However, if an affiant seeks a warrant based solely on his or her own legal conclusions, the magistrate cannot find probable cause. Id. at 992. Having concluded that Judge Wagner had a sufficient factual basis for finding probable cause, we turn to Tate's particularity argument.[19]
¶ 39. Tate argues that the order fails the Fourth Amendment's particularity requirement because it does *196 not specify a particular location where evidence will be found. When it had failed to timely obtain a warrant for the monitoring of a beeper in a home, the government made a similar argument in Karo: "it would be impossible to describe the 'place' to be searched, because the location of the place is precisely what is sought to be discovered." Karo, 468 U.S. at 718. The Supreme Court was not impressed with that logic and concluded that the government could describe the object into which the beeper would be placed and the circumstances that led the government to want to install the beeper. Id.
¶ 40. Tate's similar argument that the particularity requirement of the Fourth Amendment's warrant clause was not met fails for two reasons. First, both the United States Supreme Court and this court have upheld searches involving tracking devices despite the impossibility of describing the exact place to be searched by a traditional description, such as a street address. Id.; Brereton, 345 Wis. 2d 563, ¶¶ 52-54; Sveum, 328 Wis. 2d 369, ¶ 52. Second, we disagree with Tate's argument that since there was no physical installation of the tracking device on Tate's property in this case, as there was in Karo, Brereton, and Sveum, the order does not satisfy the particularity requirement.
¶ 41. In Sveum, we explained that "[i]n order to satisfy the particularity requirement, the warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." Sveum, 328 Wis. 2d 369, ¶ 27 (quoting State v. Noll, 116 Wis. 2d 443, 450-51, 343 N.W.2d 391 (1984)). While a description of the object into which the tracking device was to be placed was a factor in satisfying the particularity requirement in Sveum, there is no reason why another way of identifying a cell phone, such as by its electronic serial number, cannot serve the same func *197 tion as physically placing the tracking device on Tate's property. Accordingly, we conclude that the employment of the electronic serial number for Tate's phone satisfies the particularity requirement because that number permits a particularized collection of cell site information for only one cell phone. Therefore, applying great deference to Judge Wagner's probable cause determination, we conclude that the warrant passes constitutional muster.
2. Statutory sufficiency
¶ 42. No specific statutory authority is necessary to the issuance of a valid warrant for cell site information. See id., ¶¶ 69-72 (explaining that the failure to comply with all of the statutory provisions relating to warrants did not affect the validity of the warrant). However, even though statutory authorization was not necessary in order to issue the warrant, because the legislature has enacted general criteria about the procedures to employ with regard to issuing warrants, we examine relevant statutes.
¶ 43. Wisconsin Stat. § 968.10(3) authorizes searches pursuant to a valid warrant, and Wis. Stat. § 968.12(1) provides:
A search warrant is an order signed by a judge directing a law enforcement officer to conduct a search of a designated person, a designated object or a designated place for the purpose of seizing designated property or kinds of property. A judge shall issue a search warrant if probable cause is shown.
The probable cause that § 968.12(1) speaks to is comparable to probable cause under the Fourth Amendment. See id., ¶ 44; see also Bergman v. State, 189 Wis. *198 615, 617-18, 208 N.W. 470 (1926) (quoting State v. Blumenstein, 186 Wis. 428, 430, 202 N.W. 684 (1925) (ioverruled on other grounds)) (§ 968.12's predecessor, Wis. Stat. § 4839, "must be construed in accordance with the constitutional requirements upon the subject of searches and seizures").
¶ 44. Wisconsin Stat. § 968.12(1) requires a judge to issue a warrant upon a showing of probable cause, and we conclude that Judge Wagner's order was supported by probable cause. We also conclude that law enforcement's use of a stingray to locate Tate's cell phone was reasonable. Law enforcement's use of cell site information requires additional discussion because § 968.12(1) must be read in concert with Wis. Stat. § 968.13(2) and Wis. Stat. § 968.135 in order to have a more complete statutory picture when law enforcement seeks a warrant to obtain cell site information.
¶ 45. Tate explained in his brief that "[w]hen a cell phone identifies itself to a cell site, a log of location information is created and stored in a carrier's database."[20] While the record in this case does not show exactly what form this log of location information takes, we think it is safe to assume that it would come within Wis. Stat. § 968.13(2)'s broad definition of documents, *199 which "includes, but is not limited to, books, papers, records, recordings, tapes, photographs, films or computer or electronic data."[21]
¶ 46. Search warrants issued under Wis. Stat. § 968.12(1) may not authorize the seizure of documents, Wis. Stat. § 968.13(l)(c), unless they are "under the control of a person who is reasonably suspected to be concerned in the commission of that crime," § 968.13(l)(d). According to Officer Brosseau's testimony, law enforcement officers tracked Tate's cell phone using cell site information obtained from a cellular service provider. Therefore, the documents sought were in the hands of a third party; they were not "under the control of a person who is reasonably suspected to be concerned in the commission of that crime."
¶ 47. When law enforcement wants to compel a third party to turn over documents, it can proceed to obtain an order to that effect, pursuant to Wis. Stat. § 968.135. Section 968.135 provides that "a court shall issue a subpoena requiring the production of documents, as specified in s. 968.13(2)." This is done "[u]pon the request of the attorney general or a district attorney and upon a showing of probable cause."[22] Id.
*200 ¶ 48. We have held that failure to make a probable cause determination, when one is required in order to obtain particular documents, may deprive a defendant of the safeguards to which he is entitled. State v. Popenhagen, 2008 WI 55, ¶ 4, 309 Wis. 2d 601, 749 N.W.2d 611. However, Popenhagen has no application here.
¶ 49. In Popenhagen, law enforcement officers and the district attorney obtained a criminal defendant's bank records pursuant to a subpoena issued under Wis. Stat. § 805.07, the civil subpoena statute. Because they sought to obtain the record as part of a criminal investigation, they should have proceeded under the criminal subpoena statute, Wis. Stat. § 968.135, which
strictly limits a court's issuance of a subpoena for the production of documents. Only the attorney general or a district attorney may request a subpoena for the production of documents. The request must be ruled upon by the circuit court before the subpoena is issued. The circuit court may issue a subpoena for documents only upon a showing of probable cause.[23]
Id., ¶ 53. The officers in Popenhagen did not present an affidavit showing probable cause to the subpoena-issuing judges and those judges did not make the determination of probable cause that § 968.135 requires. Id., ¶ 7.
*201 ¶ 50. Unlike the defendant in Popenhagen, Tate was not deprived of Wis. Stat. § 968.135's safeguards. Judge Wagner issued the order upon the request of a district attorney. He determined that the probable cause standard had been met based on Detective Pajot's sworn affidavit. We reject the argument that the court's citation to statutes that may not have been the best choices is reversible error because Judge Wagner's analysis was consistent with the legal standard Wis. Stat. § 968.12 and Wis. Stat. § 968.135 required. Accordingly, we conclude that Tate's substantial rights were not prejudiced.
III. CONCLUSION
¶ 51. In evaluating Tate's argument, we assume without deciding that: (1) law enforcement's activities constituted a search within the meaning of the Fourth Amendment and Article I, Section 11; and (2) because the tracking led law enforcement to discover Tate's location within his mother's home, a warrant was needed. We then conclude that the search was reasonable because it was executed pursuant to a warrant that met the Fourth Amendment's and Article I, Section ll's requirements. See Higginbotham, 162 Wis. 2d at 989. We also conclude that specific statutory authorization was not necessary for Judge Wagner to issue the order that authorized the procedures used to track Tate's cell phone because the order was supported by probable cause. Nonetheless, the order did comply with the spirit of Wis. Stat. § 968.12 and Wis. Stat. § 968.135, which express legislative choices about procedures to employ for warrants and criminal subpoenas. Accordingly, we affirm the decision of the court of appeals.
By the Court. — The decision of the court of appeals is affirmed.

 State v. Tate, No. 2012AP336-CR, unpublished slip op. (Wis. Ct. App. Dec. 27, 2012).

 The Honorable Dennis R. Cimpl presided.

 The document Milwaukee County Circuit Court Judge Jeffrey Wagner signed was captioned "Order." It is this document that functioned as a warrant for our constitutional considerations and as a criminal subpoena in regard to the information obtained from the cell service provider. State v. Sveum, 2010 WI 92, ¶¶ 20, 39, 328 Wis. 2d 369, 787 N.W.2d 317 (a document entitled "order" can constitute a warrant for Fourth Amendment purposes).

 All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

 2013 Wisconsin Act 375, enacted April 23, 2014, effective April 24, 2014, sets out the actions to be taken when an investigative or law enforcement officer seeks to obtain cell phone tracking information. See Wis. Stat. § 968.373 and Wis. Stat. § 968.375(4)(c) (2013-14). These statutes were not in effect when Tate's cell phone was tracked.

 The order approved:
(1)... the installation and use of a trap and trace device or process!;]
(2) . . . the installation and use of a pen register device/process or Dialed Number Recorder (DNR) on a cellular telephone line, a designated Electronic Serial Number (ESN), an International Mobile Subscriber Identifier (IMSI), an International Mobile Equipment Identifier (IMEI), or other cellular lines of a particular subscriber!; and]
(3) . .. the release of subscriber information, incoming and outgoing call detail, cellular tower activity, cellular tower location, text header information, cellular toll information and cellular telephone global positioning system (GPS) location information, if available, and authorizing the identification of the physical location of a target cellular phone.

 With the older style analog cellular phones and digital mobile phones that are not GPS capable the cellular network provider can determine where the phone is to within a hundred feet or so using "triangulation" because at any one time, the phone is usually able to communicate with more than one of the aerial arrays provided by the phone network. The cell towers are typically 6 to 12 miles apart (less in cities) and a phone is usually within range of at least three of them. By comparing the *181 signal strength and time lag for the phone's carrier signal to reach at each tower, the network provider can triangulate the phone's approximate position.
L. Scott Harrell, Locating Mobile Phones Through Pinging and Triangulation, Pursuit (July 1, 2008), http://pursuitmag.com/ locating-mobile-phones-through-pinging-and-triangulation (last visited July 3, 2014).

 A stingray is an electronic device that mimics the signal from a cellphone tower, which causes the cell phone to send a responding signal. If the stingray is within the cell phone's signal range, the stingray measures signals from the phone, and based on the cell phone's signal strength, the stingray can provide an initial general location of the phone. By collecting the cell phone's signals from several locations, the stingray can develop the location of the phone quite precisely. Jennifer Valentino-DeVries, "Stingray" Phone Tracker Fuels Constitutional Clash, Wall Street Journal, Sept. 22, 2011, available at http://online.wsj.com/news/articles/SB100014240531119041946 04576583112723197574 (last visited July 3, 2014).

 Wisconsin Stat. § 968.27(13) defines a pen register as "a device that records or decodes electronic or other impulses that identify the numbers dialed or otherwise transmitted on the telephone line to which the device is attached." Officer Brosseau explained that a pen register "records all of the towers and sectors" on which a cell phone is operating. In other words, in order to provide cell site information to police, a cellular provider must have "its own pen register and send the results to law enforcement." Steven B. Toeniskoetter, Preventing a Modern Panopticon: Law Enforcement Acquisition of Real-Time Cellular Tracking Data, 13 Rich. J.L. & Tech. 16, ¶ 87 (2007).

 Witnesses gave conflicting testimony about whether Cobb granted law enforcement access to her apartment. Law enforcement officers said that she did, but Cobb testified that she did not, explaining that she "just opened the door, [and] they just came in" and that since "they were police, I thought they [were] supposed to come in." Transcript of Motion Hearing at 67, 70. Tate does not raise this issue, so we assume Cobb granted permission to enter her apartment. A.O. Smith Corp. v. Allstate Ins. Cos., 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) ("in order for a party to have an issue considered by this court, it must be raised and argued within its brief').

 In Riley v. California, 573 U.S. _, 134 S. Ct. 2473 (2014), the United States Supreme Court held that an officer may not "search digital information on a cell phone seized from an *187 individual who has been arrested" without prior judicial authorization. Id. at 2480. The Court explained that an individual retains a reasonable expectation of privacy in the contents of a cell phone because a search of that phone could reveal a panoply of personal information through which "[t]he sum of an individual's private life can be reconstructed." Id. at 2489. The Court discussed location information as one type, among many, of information a cell phone could contain. It did not address, however, "the question whether the collection or inspection of aggregated digital information amounts to a search under other circumstances." Id. at 2489 n.l. Additionally, Riley's applicability to the case before us is diminished because law enforcement obtained judicial authorization before tracking Tate's phone.

 The United States Supreme Court developed the third party disclosure through a series of "false friend" cases that held that "one typically retains no federal constitutional reasonable expectation of privacy in information conveyed to a third party," *189 but the "doctrine is not absolute." ABA Standards for Criminal Justice, Law Enforcement Access to Third Party Records at 6 & n.16, 7 (3d ed. 2013).

 See Florida v. Jardines, 133 S. Ct. 1409, 1416 (2013) ("introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence" constitutes a search because it is not part of a "customary invitation" to attempt entry); City of Ontario, Cal. v. Quon, 560 U.S. 746, 760-65 (2010) (concluding that city's review of employee's text messages sent on a pager provided by the city was not unreasonable and therefore did not violate the Fourth Amendment); Kyllo v. United States, 533 U.S. 27, 34 (2001) (thermal imaging of a home constituted a search because the sense-enhancing technology was not "in general public use"); Bond v. United States, 529 U.S. 334, 335, 338-39 (2000) ("physical manipulation of a bus passenger's carry-on luggage" constituted a search because a passenger does not expect fellow bus passengers or bus employees to "feel the bag in an exploratory manner," even if he may expect them to move it, and therefore handle the bag).

 The Fourth Amendment of the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

 Article I, Section 11 of the Wisconsin Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

 we generally have interpreted the state constitution to provide "the same constitutional guarantees as the Supreme Court has accorded through its interpretation of the Fourth Amendment." State v. Kramer, 2009 WI 14, ¶ 18, 315 Wis. 2d 414, 759 N.W.2d 598; see also Sveum, 328 Wis. 2d 369, ¶ 18 n.7. We follow that tradition here.

 Tate urges us to disregard the "apprehension" portion of this formulation, arguing that Warden v. Hayden, 387 U.S. 294, 307 (1967), the original source of this language, is properly regarded as dicta. Because we conclude that the phone had evidentiary value, we do not reach this argument.

 Tate cites federal cases holding that this mosaic of authority is insufficient to allow law enforcement to track a cell phone using cell site information. But, the State points out, in those cases the government sought to obtain cell site information not upon a showing of probable cause, but upon a lower statutory showing. See In re Application of the United States for an Order Authorizing the Disclosure of Prospective Cell Site Info., 412 F. Supp. 2d 947, 949 n.1 (E.D. Wis. 2006) (the issue "of whether a search warrant issued in accordance with the provisions of Rule 41 would support issuance of the requested order (if the appropriate showing were made) is not before" the court); In re Application for Pen Register & Trap ¡Trace Device with Cell Site Location Auth., 396 F. Supp. 2d 747, 765 (S.D. Tex. 2005) ("Denial of the government's request for prospective cell site data in this instance should have no dire consequences for law enforcement. This type of surveillance is unquestionably available upon a traditional probable cause showing under Rule 41."); In re Application of the United States for an Order *193 (1) Authorizing the Use of a Pen Register & a Trap & Trace Device and (2) Authorizing Release of Subscriber Info, and/or Cell Site Info., 396 F. Supp. 2d 294, 300 (E.D.N.Y. 2005) ("disclosure of cell site information turns a mobile telephone into a 'tracking device' and therefore such disclosure may not be authorized without a showing of probable cause"); In re Application of the United States for an Order Authorizing the Installation & Use of a Pen Register & a Caller Identification Sys. on Tele. Nos. [] & [] and the Prod, of Real Time Cell Cite Info., 402 F. Supp. 2d 597, 605 (D. Md. 2005) ("When the government seeks to acquire and use real time cell site information to identify the location and movement of a phone and its possessor in real time, the court will issue a warrant upon a sworn affidavit demonstrating probable cause to believe the information will yield evidence of a crime.").

 Tate does not dispute that Judge Wagner was a neutral magistrate, so we do not address that warrant requirement.

 We do not know whether US Cellular maintained this log as a matter of routine or whether it installed a pen register at law enforcement's request in order to collect cell site information for law enforcement. See Toeniskoetter, supra note 9 (cellular service providers obtain cell site information by installing their own pen register). This distinction could matter if law enforcement had not obtained prior judicial authorization for the tracking. See Wis. Stat. § 968.34(2)(a) (prohibiting the use of a pen register without prior judicial authorization, subject to certain exceptions, one of which relates to a cellular service provider's "operation, maintenance and testing of a wire or electronic communication service").

 See also In re Application of the United States for Historical Cell Site Data, 724 F.3d 600, 615 (5th Cir. 2013) ("[c]ell site data are business records").

 Because Wis. Stat. § 968.135 "does not limit or affect any other subpoena authority provided by law," we note that § 968.135 does not restrict the authority to issue a subpoena under Wis. Stat. § 968.375. Section 968.375 describes situations in which a judge may issue a subpoena or warrant to obtain records or information from an "electronic communication service or remote computing service provider." It does not limit a judge's powers under the more general subpoena statute, § 968.135. We do not decide whether § 968.375 provides an additional source of authority for Judge Wagner's order because no party has addressed § 968.375.

 The legislature chose to require probable cause for a subpoena issued under Wis. Stat. § 968.135. We note, however, that we do not decide whether the Fourth Amendment comes into play when obtaining cell site information in part because any electronic documents have necessarily been shared with a third party. See In re Application of the United States for Historical Cell Site Data, 724 F.3d at 6L4-15 (rejecting a constitutional challenge to the Stored Communication Act's "specific and articulable facts" standard for disclosure of historical cell site information because a cell phone user "voluntarily conveys ... cell site data" to the phone company "each time he makes a call").