Dissenting opinion by
Hotten, J.,
which Greene and Adkins, JJ., join.
Respectfully, I dissent from the majority opinion in this case. I agree with my brethren on the Court of Special Appeals that “... the use of a cell site simulator requires a valid search warrant, or an order satisfying the constitutional requirements of a warrant, unless an established exception to the warrant requirement applies!,]” and that the use of a pen register/trap and trace order to use a cell site simulator in this case was insufficient to satisfy that threshold. State v. Andrews, 227 Md.App. 850, 355, 134 A.3d 324, 327 (2016).
For an issuing judge to appreciate the gravity of the exercise of the requirements and parameters of the Fourth Amendment and any intrusion on a person’s privacy rights, the issuing judge must appreciate the scope and manner of the search proposed to be conducted. The more an issuing judge understands the technology associated with the device sought to be used, the better the issuing judge can appreciate the constitutional impact of the search request, particularly when the device has the capacity to conduct a very broad, intrusive search impacting the Fourth Amendment. As the Court of Special Appeals eloquently stated, “[t]he analytical framework requires analysis of the functionality of the surveillance device and the range of information potentially revealed by its use.” Andrews, 227 Md.App. at 376, 134 A,3d at 338.
*631 I. The Order In this Case Was Not A Search Warrant Within the Dictates of the Fourth Amendment
In the case at bar, the Baltimore City Police Department (“BCPD”) relied on Courts & Judicial Proceedings Article (“Cts. & Jud. Proc.”) § 10-4B-03 as its basis for seeking an order to use the Hailstorm device to locate a cell phone that was associated with the victim, Ina Jenkins. Cts. & Jud. Proc. § 10-4B-03 states:
Application or extension of order by investigative or law enforcement officers
(a) An investigative or law enforcement officer may make application for an order or an extension of an order under § 10-4B-04 of this subtitle or approving the installation and use of a pen register or a trap and trace device, in writing, under oath or equivalent affirmation, to a court of competent jurisdiction of this State.
Contents of application
(b) An application under subsection (a) of this section shall include:
(1) The identity of the State law enforcement or investigative officer making the application and the identity of the law enforcement agency conducting the investigation; and
(2) A statement under oath by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by that agency.
Cts. & Jud. Proc. § 10-4B-01 defines “pen register” and “trap and trace” as follows:
(c) (1) “Pen register” means a device or process that records and decodes dialing, routing, addressing or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted.
* * *
(d) (1) “Trap and trace device” means a device or process that captures the incoming electronic or other impulses *632 that identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication.
⅜ ‡ ⅜
The cell site simulator (hereinafter “Hailstorm device”) used by the BCPD in this case differs from both a pen register and trap & trace because it actively seeks out and provides real time location, and other information, regarding a cell phone and, presumably, the person using it.
Detective John Haley (“Det. Haley”), a member of BCPD’s Advanced Technical Team, asserted at the suppression hearing that the Hailstorm device “acts like a cell tower[,]” but then explained that when a police officer inputs the unique electronic serial number (“ESN”) associated with a specific cell phone into the Hailstorm device, the device then actively seeks out the location of that cell phone—unlike a cell phone tower, which passively awaits connection to a cell phone. Det. Haley also explained that once the Hailstorm device locates the target cell phone, “the phone thinks that the Hailstorm is the tower, the cell site. So the phone is going to connect with the Hailstorm.” Upon connecting to the Hailstorm device, the target cell phone cannot be used, except to call 9-1-1, until the cell phone is disconnected from the Hailstorm device. Det. Haley also noted that the Hailstorm device cannot connect to the target cell phone if the cell phone is in use because the phone is already connected to one or more of the service provider’s towers.
Det. Haley acknowledged that, in addition to locating the target cell phone, the Hailstorm device also collects the cell phone information for each cell phone that is located within a two-block radius of the device and is located on the same channel[1] that the Hailstorm device is using.[2] Det. Haley also *633 acknowledged that the Hailstorm device sends a signal that “goes inside” private homes in search of the target cell phone, and that the police did not obtain a separate warrant for 4014 Penhurst Avenue—where the target cell phone in this case was ultimately located. Thus, the Hailstorm device collects far more information than what is authorized by the statutory scope of the Maryland Pen Register statute.
Although the Majority does not hinge its analysis on the question of whether the Pen Register/Trap & Trace and Cellular Tracking Device order relied on in this case was constitutionally sufficient—it assumes that the order was inadequate for the purposes of the opinion—the Majority, nonetheless recognizes the strength of the State’s argument regarding that issue. See Maj. Op. at 625-26, 165 A.3d at 444-45. The Majority notes that in Wisconsin v. Tate, 357 Wis.2d 172, 849 N.W.2d 798 (2014), cert. denied, — U.S.-, 135 S.Ct. 1166, 190 L.Ed.2d 921 (2015), the Wisconsin Supreme Court considered a case similar to the case at bar, which concluded that an order based on the state’s pen register statute was sufficient to constitute a warrant in light of the content of the application and the order itself. See id. at 810. Central to the Tate Court’s holding was its determination that the Wisconsin pen register statute only required a showing that the information sought would be relevant to an ongoing criminal investigation, and the Court determined that the order was sufficiently particular because it identified a particular phone and “permit[ted] a particularized collection of cell site information for only [that] phone.” Id.
Significantly, both the Tate Court and the Majority do not acknowledge that cell site simulators not only “search” for the *634 target cell phone, but also “search” the surrounding area through the emission of a signal. In the present case, the Hailstorm device, which technologically presents significant surveillance capabilities, not only searched for the target cell phone, but also searched all of the residences in the two block radius of the device, including Respondent’s residence at 4014 Penhurst Avenue. This type of search is similar, factually, to the circumstances in Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), where the United States Supreme Court held that the use of thermal energy technology constituted a search for the purposes of the Fourth Amendment, when the police used the technology to detect heat emissions from the defendant’s home. Id. at 34, 121 S.Ct. at 2043. The Supreme Court concluded in Kyllo that “[wjhere ... the Government uses a device that is not in general public use, to explore the details of the home that would previously have been unknowable without physical intrusion, the surveillance is a ‘search’ and is presumptively unreasonable without a warrant.” Id. at 40, 121 S.Ct. at 2046. Here, the police utilized the Hailstorm device—technology that was not available to the public—to actively seek out the location of a cell phone through the emission of a signal that “explore[dj the details” of the residences within a two-block radius of the Hailstorm device “that would have previously been unknowable without” the intrusion of the signal. See id.
The State concedes for the purposes of this case that the use of the Hailstorm device to locate the target phone constituted a “search” within the meaning of the Fourth Amendment, but argues that the Pen Register/Trap & Trace and Cellular Tracking Device order was constitutionally sufficient to authorize the use of the Hailstorm device to search for the target cell phone, ie. the equivalent of obtaining a search warrant. The pen register order in this case stated that, pursuant to Cts. & Jud. Proc. § 10-4B-04: [3]
*635 that as part of a criminal investigation of Unknown Person or Persons and others as yet unknown, the Baltimore Police Department (BPD), Drug Enforcement Agency (DEA), Federal Bureau of Investigation (FBI), United States Marshals Service (USMS), United States Secret Service (USSS), Immigration Customs Enforcement (ICE), Alcohol Tobacco and Firearms (ATF), Sytech, or any other designated law enforcement agency (hereinafter referred to as “Agencies”) are authorized to use for a period of sixty (60) days from the date of installation, a Pen Register\Trap & Trace and Cellular Tracking Device to include cell site information, call detail, without geographical limits, which shall be installed *636 and used within the jurisdiction of this Court, upon the telephone having the number(s): [XXX-XX] -4686, a AT&T; Sprint/Nextel; Virgin Mobile; T-Mobile; Célico Partnership, DBA Verizon Wireless, Verizon; Cricket Communications, Inc; and/or any other Telecommunication service provider, telephone; and it is further
ORDERED, that the Agencies shall complete the necessary installation of the Pen Register\Trap & Trace and Cellular Tracking Device ... to employ surreptitious or duplication of facilities, technical devices or equipment to accomplish the installation and use of a Pen Register\Trap & Trace and Cellular Tracking Device, unobtrusively and with a minimum interference to the service of the subscriber(s) of the aforesaid telephone, and shall initiate a signal to determine the location of the subject’s mobile device on the service provider’s network or with such other reference points as may be reasonably available, Global Position System Tracing and Tracking, Mobile Locator tools, R.T.T. (Real Time Tracking Tool), Precision Locations and any and all locations, and such provider shall initiate a signal to determine the location of the subject’s mobile device on the service provider’s network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent/agencies serving this order[.]
* * *
The Majority notes that the order authorizes the BCPD to use a “Cellular Tracking Device” and “Real Time Tracking Tool” to, among other things, employ “surreptitious or duplication of facilities” and “initiate a signal to determine the location of the subject’s mobile phone” and that they will be engaged in “real time tracking” of the specific cell phone identified by number. See Maj. Op. at 628-29, 166 A.3d at 446-47. The Majority does not take into account that the terms “Cellular Tracking Device” and “Real Time Tracking Tool” are neither referenced nor defined in the Maryland Pen Register Statute, and that neither the application nor the order in this case provide definitions for those terms. In fact, the pen register applica *637 tion submitted in this case, and the resulting order, omitted any description of the Hailstorm device. Additionally, the description of the activity that the order authorizes, specifically the authority to “initiate a signal” does not adequately describe how the Hailstorm device works. As noted, supra, the Hailstorm device not only emits a signal to locate the target phone, but it also forcibly connects the target cell phone to the device, rendering the phone inoperable by the user for the duration that the phone is connected to the Hailstorm device.
Even ignoring the fact that the order relied on a statute that did not authorize the type of technology that was used, the order also did not comply with the particularity requirement because it failed to adequately describe “the place to be searched[.]” See United States v. Grubbs, 547 U.S. 90, 97, 126 S.Ct. 1494, 1500, 164 L.Ed.2d 195 (2006). While the order did identify the specific cell phone that would be targeted by the Hailstorm device, the order also also authorized the BCPD to use the “Pen Register\Trap & Trace and Cellular Tracking device to include cell site information, call detail, without geographic limits,” thereby, failing to adequately describe “the place to be searched” ie. the Penhurst neighborhood where the search was ultimately conducted. The breadth of the language in the order allows the BCPD to activate the Hailstorm device in an area, for up to 60 days, with the potential of intruding on the privacy of thousands of individuals’ privacy in search of the target cellphone. Such an order cannot suffice as a warrant that satisfies the dictates of the Fourth Amendment because the Fourth Amendment prohibits general warrants. See Andresen v. Maryland, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) (“General warrants, of course, are prohibited by the Fourth Amendment ... ‘[T]he problem [posed by the general warrant] is not that of intrusion Per se, but of a general, exploratory rummaging in a person’s belongings .... (The Fourth Amendment addresses this problem) by requiring a ‘particular description’ of the things to be seized.’ ”) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)) (alterations in original). Accordingly, to the extent the *638 Majority found the State’s argument persuasive that the pen register order in this case was constitutionally sufficient, I respectfully disagree. See Maj. Op. at 625-26, 165 A.3d at 444-45.
II. The Good Faith Exception to the Exclusionary Rule Cannot Apply
I also disagree with the Majority’s conclusion that the police officers in this case were engaged in “objectively reasonable law enforcement activity” when they used the Hailstorm device in reliance on the language contained in the Pen Register/Trap & Trace and Cellular Tracking Device order. The Majority found persuasive Detective Brian Kershaw’s (“Det. Kershaw”) testimony that applications for similar orders had been approved “many, many times" and were never denied. See Maj. Op. at 625-26, 165 A.3d at 444-45, The Majority acknowledged that the BCPD was subject to a nondisclosure agreement regarding the Hailstorm technology,[4] but determined that “the testimony at the hearing in this case was that the detectives would have answered any questions of the issuing judge about what they planned to do.” Maj, Op. at 628-29, 165 A.3d at 446-47 (emphasis in original). While it is true that Det. Haley testified that he would have answered any questions that the issuing judge may have had regarding the modified language in the application and order, I find it disingenuous for Det. Haley to state in 2016 that he would have been forthcoming about the Hailstorm technology at the time the order was issued in February 2014, in light of the nondisclosure agreement, which he acknowledged required Baltimore City police officers “to basically not talk about the— not talk about the Hailstorm.”
The Supreme Court has held that there are four circumstances where the good faith exception to the exclusionary rule does not apply, and suppression remains the appropriate *639 remedy if: (1) the magistrate or judge issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his or her reckless disregard of the truth; (2) the issuing magistrate has wholly abandoned his or her judicial role; (3) the warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) the warrant is so facially deficient—ie, failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. See United States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984) (citations omitted). The Majority concluded that none of the four reasons identified by the Leon Court applied in the present case. I disagree. I find that the fourth circumstance is applicable in this case because it was unreasonable for the police officers to presume that the Pen Register/Trap & Trace and Cellular Tracking Device order was sufficient to authorize their use of the Hailstorm device. As discussed, supra, the Pen Register/Trap & Trace and Cellular Tracking Device Order is not a search warrant pursuant to the Fourth Amendment because it was neither represented as a warrant when presented to the issuing judge nor did it comport with the dictates of the Fourth Amendment requiring that a warrant particularly describe the place to be search or the technology to be used in conducting the search. Accordingly, for the Pen Register/Trap & Trace and Cellular Tracking Device to be facially sufficient to authorize the use of the Hailstorm device it was required to specify the place to be searched, ie. the area where the police officers intended to employ the Hailstorm device. The order does not reference a specific area the police intended to employ the Hailstorm device, it only referenced the cell phone number that was subject to the order.
The order also failed to adequately describe the type of technology that the police officers intended to use in this case. The Majority asserts that the alleged defect in the application and order is not that they failed to apprise the issuing judge that a cellular tracking device would be used to do real-time *640 tracking that involved initiating a signal, but that they failed to go into greater detail about that technology. See Maj. Op. at 626-27, 165 A.3d at 445-46. The Majority then concludes that “the application and order clearly inform a reasonably diligent reader of what the officers seek to do and how they plan to do it (even if they do not describe the details).” Id. I disagree. I find that the application and order are silent regarding the Hailstorm technology and how it functions. As noted, supra, the Hailstorm device does not just “initiate a signal” to track a cell phone, it forces the target cell phone to connect to the device, rendering the target cell phone inoperable for the duration that it is connected to the Hailstorm device. The Hailstorm device also collects the cell phone information of all surrounding cell phones that are located within a two-block radius of the Hailstorm device and use the same channel that the Hailstorm device utilizes to emit its signal. Nothing in the language of the application or order in this case suggests that the police intended to use this type of invasive technology.
The Majority observes in a footnote that “statutes that implement the requirements of the Fourth Amendment for searches arguably more intrusive than one undertaken with a cell site simulator do not require an officer [to] explain in detail the technical specifications of a particular device used to carry out a proposed search.” Maj. Op. at 628 n. 67, 165 A.3d at 445 n. 67. As an example, the Majority notes that “the statutes governing the authorization of a wiretap—essentially, a search warrant that allows for the interception of private communications in real time—do not require such [technical] detail.” Id. (citing Cts. & Jud. Proc. § 10-401, et seq.; 18 U.S.C. § 2610, et seq.). The Majority summarizes the requirements necessary for an application to obtain a wiretap pursuant to the above-referenced statutes, and concludes that police officers neither “go beyond the requirements of those statutes to detail the particular technology utilized to effect a wiretap when applying for one[,]” nor are required to do so, pursuant to the U.S. Supreme Court decision in Dalia v. United States, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979), which *641 explicitly held there was no requirement that they do so. See id. (citing Dalia, 441 U.S. at 257, 99 S.Ct. at 1693).
In relying on the wiretapping statutes in support of its view, the Majority does not consider the fact that, unlike the procedures set forth in the wiretapping statutes, at all times relevant to this case, there was no statute governing the use of cell site simulators. Cf. Criminal Procedure Article § 1-203.1 (effective October 1, 2014). Additionally, while it is true that the wiretapping statutes, and other statutes implementing the requirements of the Fourth Amendment for searches, do not require a detailed recitation of the technical specifications of a particular device an officer plans to use, no such detail is required precisely because there is a statute that governs the use of the technology and describes the technology that is intended to be used to conduct the Fourth Amendment search. Considering the Majority’s example of the Maryland wiretapping statute, Cts. & Jud. Proc. § 10-406(a) states that:
(a) The Attorney General, State Prosecutor, or any State’s Attorney may apply to a judge of competent jurisdiction, and the judge, in accordance with the provisions of § 10-408 of this subtitle, may grant an order authorizing the interception of wire, oral, or electronic communications by investigative or law enforcement officers when the interception may provide or has provided evidence of the commission of:
(1) Murder;
(2) Kidnapping;
(3) Rape;
(4) A sexual offense in the first or second degree;
(5) Child abuse in the first or second degree;
(6) Child pornography under § 11-207, § 11-208, or § 11-208.1 of the Criminal Law Article;
(7) Gambling;
(8) Robbery under § 3-402 or § 3-403 of the Criminal Law Article;
*642 (9) A felony under Title 6, Subtitle 1 of the Criminal Law Article;
(10) Bribery;
(11) Extortion;
(12) Dealing in a controlled dangerous substance, including a violation of § 5-617 or § 5-619 of the Criminal Law Article;
(13) A fraudulent insurance act, as defined in Title 27, Subtitle 4 of the Insurance Article;
(14) An offense relating to destructive devices under § 4-503 of the Criminal Law Article;
(15) A human trafficking offense under § 11-303 of the Criminal Law Article;
(16) Sexual solicitation of a minor under § 3-324 of the Criminal Law Article;
(17) An offense relating to obstructing justice under § 9-302, § 9-303, or § 9-305 of the Criminal Law Article;
(18) Sexual abuse of a minor under § 3-602 of the Criminal Law Article;
(19) A theft scheme or continuing course of conduct under § 7-103(f) of the Criminal Law Article involving an aggregate value of property or sources or services of at least $10,000;
(20) Abuse or neglect of a vulnerable adult under § 3-604 or § 3-605 of the Criminal Law Article;
(21) An offense relating to Medicaid fraud under §§ 8-509 through § 8-515 of the Criminal Law Article; or
(22) A conspiracy or solicitation to commit an offense listed in items (1) through (21) of this subsection.
Cts. & Jud. Proc. § 10-408 states, in relevant part:
Applications for interception in writing
(a) (1) Each application for an order authorizing the interception of a wire, oral, or electronic communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant’s *643 authority to make the application. Each application shall include the following information:
(i) The identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;
(ii) A full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including:
1. Details as to the particular offense that has been, is being, or is about to be committed;
2. Except as provided in paragraph (2) of this subsection, a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted;
3. A particular description of the type of communications sought to be intercepted; and
4. The identity of the person, if known, committing the offense and whose communications are to be intercepted;
(iii) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;
(iv) A statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe additional communications of the same type will occur thereafter;
(v) A full and complete statement of the facts concerning all previous applications known to the individual authoring and making application, made to any judge for authorization to intercept wire, oral, or electronic communications involving any of the same persons, facili *644 ties or places specified in the application, and the action taken by the judge on each application; and
(vi) Where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain the results.
(2) (i) In the case of an application authorizing the interception of an oral communication, a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted is not required if the application:
1. Is by an investigative or law enforcement officer;
2. Is approved by the Attorney General, the State Prosecutor, or a State’s Attorney;
3. Contains a full and complete statement as to why specification of the nature and location of the facilities from which or the place where the communication is to be intercepted is not practical; and
4. Identifies the individual committing the offense and whose communications are to be intercepted.
(ii) In the case of an application authorizing the interception of a wire or electronic communication, a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted is not required if the application:
1. Is by an investigative or law enforcement officer;
2. Is approved by the Attorney General, the State Prosecutor, or a State’s Attorney;
3. Identifies the individual believed to be committing the offense and whose communications are to be intercepted;
4. Makes a showing that there is probable cause to believe that the individual’s actions could have the effect of thwarting interception from a specified facility; and
5. Specifies that interception will be limited to any period of time when the investigative or law enforce *645 ment officer has a reasonable, articulable belief that the individual identified in the application will be proximate to the communication device and will be using the communication device through which the communication will be transmitted.
[[Image here]]
Grounds for ex parte interception order
(c) (1) Upon the application the judge may enter an ex parte order, as requested or as modified, authorizing interception of wire, oral, or electronic communications within the territorial jurisdiction permitted under paragraphs (2) and (3) of this subsection, if the judge determines on the basis of the facts submitted by the applicant that:
(i) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in § 10-406 of this subtitle;
(ii) There is probable cause for belief that particular communications concerning that offense will be obtained through interception;
(iii) Normal investigative procedures have been tried and have failed or reasonable appear to be unlikely to succeed if tried or to be too dangerous; and
(iv) There is probable cause for belief:
1. That the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of the offense, or are leased to, listed in the name of, or commonly used by this person in accordance with subsection (a)(1) of this section; or
2. That the actions of the individual whose communications are to be intercepted could have the effect of thwarting an interception from a specified facility in accordance with subsection (a)(2) of this section.
*646 (2) Except as provided in paragraphs (3) and (4) of this subsection, an ex parte order issued under paragraph (1) of this subsection may authorize the interception of wire, oral, or electronic communications only within the territorial jurisdiction of the court in which the application was filed.
(3) If an application for an ex parte order is made by the Attorney General, the State Prosecutor, or a State’s Attorney, an order issued under paragraph (1) of this subsection may authorize the interception of communications received or sent by a communication device anywhere within the State so as to permit the interception of the communications regardless of whether the communication device is physically located within the jurisdiction of the court in which the application was filed at the time of the interception. The application must allege that the offense being investigated may transpire in the jurisdiction of the court in which the application is filed.
(4) In accordance with this subsection, a judge of competent jurisdiction may authorize continued interception within the State, both within and outside the judge’s jurisdiction, if the original interception occurred within the judge’s jurisdiction.
Contents of ex parte interception orders
(d) (1) Each order authorizing the interception of any wire, oral, or electronic communication shall specify:
(i) The identity of the person, if known or required under subsection (a)(2) of this section, whose communications are to be intercepted;
(ii) The nature and location of the communications facilities as to which, or the place where, authority to intercept is granted, if known;
(iii) A particular description of the type of communications sought to be intercepted, and a statement of the particular offense to which it relates;
*647 (iv) The identity of the agency authorized to intercept the communications, and of the person authorizing the application; and
(v) The period of time during which the interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.
(2) An order authorizing the interception of a wire, oral, or electronic communication, upon request of the applicant, shall direct that a provider of wire or electronic communication service, landlord, custodian or other person furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that the service provider, landlord, custodian, or person is according the person whose communications are to be intercepted. Any provider of wire or electronic communication service, landlord, custodian or other person furnishing the facilities or technical assistance shall be compensated therefor by the applicant for reasonable expenses incurred in providing facilities or assistance.
* * *
Motions to suppress by aggrieved persons
(i) (1) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of this State or a political subdivision thereof, may move to suppress the contents of any intercepted wire, oral, or electronic communication, or evidence derived therefrom, on the grounds that:
(i) The communication was unlawfully intercepted;
(ii) The order of authorization under which it was intercepted is insufficient on its face, or was not obtained or issued in strict compliance with this subtitle; or
*648 (iii) The interception was not made in conformity with the order of authorization.
* * *
Cts. & Jud. Proc. § 10-401(10) defines “[intercept” as “the aural or other acquisition of the contents of any wire, electronic, or oral communications through the use of any electronic, mechanical, or other device.” Cts. & Jud. Proc. § 10—401(5)(i) defines “[electronic communication” as “any transfer of signs, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system.” Sub-paragraph (ii) also states that “electronic communication does not include: (1) [a]ny wire or oral communication; (2) [a]ny communication made through a tone-only paging device; or (3) [a]ny communication from a tracking device.” An “[o]ral communication” is defined to mean “any conversation or words spoken to or by any person in a private conversation.” Cts. & Jud. Proc. § 10— 401(13)(i). The statutes also defines “[w]ire communication” as
any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of a connection in a switching station) furnished or operated by any person licensed to engage in providing or operating such facilities for the transmission of communications.
Cts. & Jud. Proc. § 10-401(18). Finally, Cts. & Jud. Proc. § 10-401(8) defines “[electronic, mechanical, or other device” to mean
any device or electronic communication other than:
(i) Any telephone or telegraph instrument, equipment or other facility for the transmission of electronic communications or any component thereof,
(a) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by the subscriber or user for con *649 nection to the facilities of the service and used in the ordinary course of its business; or
(b) being used by a communications common carrier[5] in the ordinary course of its business, or by an investigative or law enforcement officer in the ordinary course of his duties; or
(ii) A hearing aid or similar device being used to correct subnormal hearing to not better than normal.
As noted, supra, and in contrast to the above-quoted statutory scheme for wiretapping in the State of Maryland, the order relied on by the police in the present case was based on the Maryland Pen Register Statute, which exclusively describes the pen register and trap & trace technologies and neither of which remotely describe cell site simulator technology. See Cts. & Jud. Proc. § 10—4B—01(e)(1), (d)(1). Thus, while as a general matter it is true that when a law enforcement officer is applying for a search warrant pursuant to a statute that “implement[s] the requirements of the Fourth Amendment for searches” he or she is not required to “go beyond the requirements of those statutes to detail the particular technology utilized.” See Maj. Op. at 628 n. 67, 165 A.3d at 446 n. 67; see also Dalia, 441 U.S. at 257, 99 S.Ct. at 1693. Where, as in this case, however, a law enforcement officer does not rely on a statute that details the type of technology the warrant, or order in this case, would apply to, he or she is required to provide a description of the technology he or she intends to use in sufficient detail for an issuing judge to appreciate the scope of the potential infringement on a person’s Fourth Amendment privacy interests, and the officer’s failure to do so results in a warrant so deficient on its face that the good faith exception to the exclusionary rule should not apply.
Accordingly, I conclude it was unreasonable for the police officers in this case to presume that the Pen Register/Trap & Trace and Cellular Tracking Device order authorized them to *650 use the Hailstorm device. The circuit court correctly suppressed the evidence that was subsequently discovered in the Respondent’s home.
Judges Greene and Adkins have authorized me to state that they join in this opinion.

. Det. Haley explained that Verizon, the service provider in this case, has about ten channels and that cell phones in a given area will seek out the strongest channel to transmit signals. Det. Haley also explained that the Hailstorm device works the same way, it surveys the area *633 where it is activated to determine the strongest channel to transmit, and utilizes that channel to locate the target cell phone. Det. Haley acknowledged that the Hailstorm device can collect the information of anywhere between dozens to hundreds of cell phones that are not the target phone the Hailstorm device is searching for.

. Det. Haley testified that at the end of each night the police delete all the cell phone information that was stored on the Hailstorm device from its use during the day.

. Cts. & Jud. Proc. § 10-4B-04 states, in relevant part:
Information obtained relevant to criminal investigations
*635 (a)(1) Upon application made under § 10-4B-03 of this subtitle, the court shall enter an ex parte order authorizing the installation and use of a pen register or a trap and trace device within the jurisdiction of tiie court if the court finds that information likely to be obtained by the installation and use is relevant to an ongoing criminal investigation,
[[Image here]]
Contents of order
(b) An order issued under this section shall:
(1) Specify the identity, if known, of the person to whom is leased or in whose name is listed the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied;
(2) Specify the identity, if known, of the person who is the subject of the criminal investigation;
(3) Specify the attributes of the communications to which the order applies, including the number or other identifier and, if known, the location of the telephone line or other facility to which the pen register or trap and trace device is to be attached or applied, and, in the case of a trap and trace device, the geographic limits of the trap and trace order;
(4) Contain a description of the offense to which the information likely to be obtained by the pen register or trap and trace device relates; and
(5) Direct, upon the request of the applicant, the furnishing of information, facilities, and technical assistance necessary to accomplish the installation of the pen register or trap and trace device under § 10-4B-05 of this subtitle.
Duration of order
(c) (1) An order issued under this section shall authorize the installation and use of a pen register or a trap and trace device for a period not to exceed 60 days.
[[Image here]]

. See Andrews, 227 Md.App. at 374-77, 134 A.3d at 337-339 (discussing the terms of the nondisclosure agreement entered into between the State’s Attorney for Baltimore City and the Federal Bureau of Investigation as a condition of the Baltimore City Police Department’s use of "certain 'wireless collection equipment/technology manufactured by [the] Harris [Corporation].’ ’’).

. The statute defines a "[c]ommunications common carrier” as "any person engaged as a common carrier for hire in the transmission of wire or electronic communications.” Cts. & Jud. Proc. § 10-401(3).